**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF NEW YORK**

FAGE DAIRY INDUSTRY,  S.A., FAGE
USA DAIRY INDUSTRY,  INC., and
FAGE LUXEMBOURG, S.Á.R.L.,

       **Plaintiffs,**

v.                                **Civil No. 6:11-cv-01174-(DEP)**

GENERAL MILLS, INC. and
GENERAL MILLS IP HOLDINGS II,
LLC,

       **Defendants.**


GENERAL MILLS, INC. and
GENERAL MILLS IP HOLDINGS II,
LLC,

**Plaintiffs,**

v.

                                    **Civil Action No. 6:12-CV-0920 (DEP)**

FAGE DAIRY PROCESSING
INDUSTRY, S.A., FAGE USA DAIRY
INDUSTRY, INC., FAGE USA
HOLDINGS, INC., FAGE USA, CORP.,
and FAGE LUXEMBOURG, S.Á.R.L.

**Defendants.**


<u>**MEMORANDUM IN SUPPORT OF GENERAL MILLS' MOTION TO EXCLUDE**</u>
<u>**TESTIMONY OF RONALD R. BUTTERS, Ph.D.**</u>

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 2

OVERVIEW OF BUTTERS'S REPORT AND OPINIONS ................................. 3

ARGUMENT ..................................................................................................... 6

I.    BUTTERS'S TESTIMONY LACKS THE INDICATIONS OF RELIABILITY
PRESCRIBED BY RULE 702 AND *DAUBERT* ........................................... 7

    A.    Butters Relies Solely on his Personal Impressions of an Incomplete and
Biased Set of Examples. ................................................................... 7

    B.    Butters Fails to Address Obvious Gaps and Inconsistencies in His
Analysis. ........................................................................................ 10

        1.    Dr. Butters contradicts himself on the "fame" of the TOTAL
mark ...................................................................................... 10

        2.    Dr. Butters' comparisons to other uses of "total" are
inapposite ............................................................................. 10

        3.    Dr. Butters ignores the empirical evidence of consumer
confusion .............................................................................. 10

II.    BUTTERS'S TESTIMONY INVADES THE JURY'S PROVINCE. ................... 11

III.    BUTTERS'S TESTIMONY IS IRRELEVANT, CUMULATIVE, AND
MISLEADING. ...................................................................................... 15

    A.    Butters's Linguistic Analysis Does Not "Fit" the "Ordinarily Prudent
Purchaser" Standard. ..................................................................... 15

    B.    Butters's Opinions are Cumulative of Fage's Other Experts' Testimony.
..................................................................................................... 15

    C.    The Potential for Butters's Testimony to Mislead Outweighs Its
Probative Value. ............................................................................ 16

CONCLUSION ................................................................................................ 17

## INTRODUCTION

The expert testimony of Dr. Ronald Butters, a linguist retained by Fage, should be excluded on three grounds:

1.  His opinions derive not from the application of replicable methods to objective data, but from his personal impressions of an incomplete and biased set of examples, and as such they lack the indications of reliability required by Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993);

2.  In opining that consumer confusion about the parties' use of "TOTAL" is "inconceivable," Dr. Butters tells the jury what to conclude and exceeds the limited scope of "ultimate issue" testimony permitted under Fed. R. Evid. 704(a);

3.  Dr. Butters's linguistic analysis is far removed from the perspective of the "ordinarily prudent purchaser," and therefore does not "fit" the standard for assessing the likelihood of confusion; moreover, his personal observations are cumulative of Fage's survey evidence and likely to mislead the jury.  His testimony should be excluded as irrelevant, cumulative, and misleading under Fed. R. Evid. 401(a) and 403.

Although styled as linguistic analysis, Dr. Butters's testimony amounts to nothing more than *ipse dixit* conclusions based on his shopping habits and his assumptions about consumer behavior.  Jurors are well equipped to make their own judgments based on their own consumer experiences, without direction from Dr. Butters.  His testimony should therefore be excluded in its entirety.

## OVERVIEW OF BUTTERS'S REPORT AND OPINIONS

In his words, Dr. Butters was engaged by Fage "to examine the word 'TOTAL' in its current meaning and usage in American English with specific reference to its meaning and use by the two parties in this case." (Ex. A, Butters Dep. at 29:6-10.)  In carrying out this assignment, Dr. Butters reviewed documents provided by Fage's counsel, "did some internet searching," and sent his assistant to a grocery store to buy a container of Fage's TOTAL and a box of TOTAL®. (*Id.* at 30:17-24, 31:8-11, 32:20-33:18, and 66:16-20.) He also consulted the dictionary and reviewed two articles discussing "the bathtub effect" – the tendency for people to remember the beginnings and ends of words better than the middles. (Ex. B, Butters Rpt., Exhibits D-10 through D-16.)

Among the documents Fage's counsel provided to Dr. Butters were different iterations of Total® cereal boxes from the past several years, including some that are no longer sold.[1] (*Id.,* Figs. 1, 2, 8, 9, 10.)   But Fage's counsel did not ask him to examine a comparable range of Fage's packaging – instead, he was instructed only "to analyze the *current* use of the Fage mark." (Ex. A, Butters Dep. at 119:5-15 (emphasis added).)  Thus, although the keyword search "Fage Total" yields 15 results from the U.S. Patent and Trademark Office's online trademark database,[2] Dr. Butters only reviewed eight of them. (Ex. B, Butters Rpt. at 3 n.3 (listing serial numbers 77037793, 77037808, 77037835, 77037851, 77037869, 77037897, 77037905, and 77037924).)  The package designs he ignored included, from left to right, serial nos. 76016813, 76016812, 76016810, and 75597292:

---

[1] The products shown in Figs. 2, 8, and 9 are no longer sold.  *See* http://www.totalcereal.com/whole-grain.aspx.

[2] *See* printout of USPTO Trademark Database search result for "fage total" (Ex. C).

3



Dr. Butters does not follow "a methodological approach that says we have to go down this laundry list." (Ex. A, Butters Dep. at 58:24-59:1.)   For this assignment, Dr. Butters considered four aspects of the parties' use of "TOTAL":

- The sound structure (PHONOLOGY) of the two terms

- The appearance of the two terms (both in their spelling or ORTHOGRAPHY and in their SEMIOTIC relationship to contextual supralinguistic material, such as color)

- The communicative context of the terms' use (PRAGMATICS) and

- The meaning (SEMANTICS) of the two terms.

(Ex. B, Butters Rpt. at 2-3.)   Or, more simply put, Dr. Butters compared the sound, spelling, format, context, and meaning of "Total" as used by Fage and General Mills.

In performing this task, Dr. Butters was not informed by consumer research or any objective data reflecting consumers' perceptions.  (Ex. A, Butters Dep. at 74:7-15; 88:14-18.) Instead, he drew from his own experiences as a consumer.  (*Id.* at 106:13-14 ("[T]his is my experience in going into stores"), 133:19-134:7 (visited five different stores over two months while preparing his report).)  He also relied on certain presumptions about consumers generally, such as:

- "[I]t is sociolinguistically valid to assume that the conclusions that I have arrived at here apply … to the large subset of the general population who are consumers of

Greek strained yogurt and/or vitamin-fortified ready-to-eat cereal," including "ordinary reasonable post-pubescent speakers of contemporary American English." (Ex. B, Butters Rpt. at 1-2)

- "People who purchase ready-to-eat cereal do not randomly walk through stores, impulsively picking out items and placing them in their shopping baskets." (*Id.* at 24.)

- "[V]itamin-fortified breakfast cereal requires some preparation in that it generally has to be placed in a bowl, after which sweetener and milk are normally added; whereas Greek strained yogurt is designed to be eaten straight from the opened package." *Id.* at 22.

When asked to explain the basis for each of these assumptions, Dr. Butters responded:

- "[B]ecause there's nothing – nothing demonstrable to the contrary." (Ex. A, Butters Dep. at 49:15-16.)

- "It's partly inferential, I suppose ..." (*Id.* at 107:12-13.)

- "This is shared cultural knowledge that you have, that I have and it's not really disputable." (*Id.* at 102:15-17.)

After comparing the parties' respective trademarks, Dr. Butters offers the following conclusions:

- *Spelling and Pronunciation* – Notwithstanding the parties' use of exactly the same word – "Total" – "differences in pronunciation and spelling are so pronounced that these linguistic factors will not contribute to linguistic confusion." (Ex. B, Butters Rpt. at 29.)

- *Format* – The examples of Fage's packaging that he reviewed – inexplicably ignoring the four designs shown above – "do nothing to raise the word **<Total>** to prominence;" moreover, "considerable differences in typography, imagery, and color" make the likelihood of confusion "virtually nonexistent." (*Id.* at 13, 29.)

- *Context* – "[T]he context of purchase of the two products is even more definitive in its inhibition of any opportunity" for consumer confusion, because "[t]he points of sale are far removed from each other," and "[t]he referents of *total* for the two companies are as different as … cereal and Greek strained yogurt." (*Id.* at 22, 30.)

- *Meaning* – "Total" is "too weak to … engage consumer memory in any way that will cause a link in the minds of consumers" between General Mills' TOTAL and Fage's TOTAL. (*Id.* at 30.)

Linguistics is a specialized academic discipline, and Dr. Butters is indisputably a credentialed linguist. But aside from his use of linguistic terminology, his analysis is not "technical or scientific" within the meaning of Rule 702. He did exactly what the Court and the jury will do: he compared the marks and assessed – in his own mind, with no support from actual consumer research – whether consumers are likely to be confused about the source of the products.

## **ARGUMENT**

Before Dr. Butters can testify, the Court must first determine "whether [his] proffered testimony has a sufficiently reliable foundation to permit it to be considered." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) (internal quotation marks omitted). Rule 702 requires that he ground his testimony on sufficient data, employ reliable principles and methods, and apply those principles and methods reliably to the facts of this case. Fed. R. Evid.

702.  The Court, in evaluating each step of Dr. Butters's analysis, "should undertake a rigorous examination of the facts on which [he] relies, the method by which [he] draws an opinion from those facts, and how [he] applies the facts and methods to the case at hand." *Amorgianos*, 303 F.3d at 267.  As the Supreme Court famously said:

> Trained experts commonly extrapolate from existing data. But nothing in *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.

*General Electric v. Joiner*, 522 U.S. 136, 146 (1997).

The Court must also screen Dr. Butters's testimony for relevance; that is, whether his analysis "fits" the facts of the case and "ha[s] any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Daubert,* 509 U.S. at 594-95; *Amorgianos*, 303 F.3d at 265 (2d Cir. 2002) (internal quotation marks omitted).  Finally, to complete its gatekeeping role, the Court should weigh the probative value of Dr. Butters' testimony against the risk that it will waste time, create confusion, or mislead the jury.  Fed. R. Evid. 403; *Daubert*, 509 U.S. at 595.

## I.    BUTTERS'S TESTIMONY LACKS THE INDICATIONS OF RELIABILITY PRESCRIBED BY RULE 702 AND *DAUBERT*.

### A.    Butters Relies Solely on his Personal Impressions of an Incomplete and Biased Set of Examples.

To be admissible, scientific evidence and expert testimony must have a traceable, analytical basis in objective fact.  *Bragdon v. Abbott,* 524 U.S. 624, 653 (1998).  Dr. Butters's interpretation of the parties' trademarks, by contrast, is entirely subjective.  Although he claims that a proper assessment of linguistic confusion "would have to be based upon the analysis of

7

empirical data," (Ex. A, Butters Dep. at 72:15-18), there is no data behind his opinions.  For example:

> Q.    What particular data did you review to analyze the pronunciation and spelling?
>
> A.    … I relied upon my knowledge of – as a speaker of American English and my experience as a linguist….

(*Id.* at 67:12-18.)  Similarly, when asked to explain the basis for his statements about where yogurt and breakfast cereal are located in grocery stores, he responded "this is my experience in going into stores."  (*Id.* at 106:3-107:3.)  He added that his "online searching for images of yogurt displays and cereal displays … confirmed my empirical – confirmed my knowledge based upon my – my experience and knowledge."  (*Id.*)

In this manner, every aspect of Dr. Butters's analysis depends entirely on his experience, either as a linguist or as a "member of our culture." (*Id.* at 101:19-102:17; *see also id.* at 96:22-97:4 (use of "wavy brackets" on TOTAL® cereal box "is unusual *in my experience* in packaging") and 125:21-24 ("*My experience* is that [Red Bull Total Zero] is purchased in many different kinds of fast – express purchase, small grocery stores and large grocery stores") (emphasis added).)  Dr. Butters neither conducted nor relied upon any consumer research. Moreover, other than dictionary entries, the only published works of scholarship he cites are the two articles on "the bathtub effect" – and those offer at best inferential support for his point.[3]

---

[3] Dr. Butters claims "the bathtub effect" would cause consumers to ignore the word "Total" in parties' trademarks because of its placement in the middle of a phrase.  (Ex. B, Butters Rpt. at 8.) The articles he cites, however, document the phenomenon at the level of *words*, not phrases. *See id.*, Ex. D-10 at 134 ("People remember the beginnings and ends of *words* better than the middles, as if the *word* were a person lying in a bathtub") and  Ex. D-11 at 19 ("[M]emory storage of *words* assigns greater weight to the two ends of the *words* than to the middle"). Butters does not disclose, much less justify, his analytical leap from words to phrases.

Finally, Dr. Butters cannot explain why he reviewed packaging designs for a range of TOTAL® products, including several that are obsolete, but only looked at Fage's packaging for products "sold in the stores today."  (*See* Ex. A, Butters Dep. at 118:11-119:15.)  His answer – that Fage's counsel did not ask him to review Fage's earlier designs – does not bridge the gap in his reasoning; instead, it suggests that counsel inappropriately biased his selection of the parties' relevant trademark usages.

Dr. Butters has not "employ[ed] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Kumho Tire Co., Ltd. V. Carmichael*, 526 U.S. 137, 152 (1999).  Not tethered to any objective data or published research, his opinions are supported only by his subjective impressions and his *ipse dixit*.  Dr. Butters' testimony should therefore be excluded.  *Nimely v. City of New York*, 414 F. 3d 381, 398-99 (2d Cir. 2005) (excluding expert testimony because expert's "personal view … is simply not a sufficiently reliable ground" and "amount[ed] to the sort of *ipse dixit* connection between methodology and conclusion that the district court has the duty to exclude under Rule 702"); *see also GST Telecomms. v. Irwin*, 192 F.R.D. 109, 111 (S.D.N.Y. 2000) (expert testimony predicated on "subjective belief" and "unsupported speculation" does not meet *Daubert* criteria), and *Matthews v. First Revenue Assurance LLC*, No. 00 C 3711, 2001 WL 864272 (N.D. Ill. July 31, 2001) (Ex. D) (excluding linguist's expert testimony as "unsupported by anything other than [his] *ipse dixit*").

**B.      Butters Fails to Address Obvious Gaps and Inconsistencies in His Analysis.**

**1.      Dr. Butters contradicts himself on the "fame" of the TOTAL mark**

Dr. Butters acknowledges, as he must, that TOTAl is a "venerable" trademark that General Mills has advertised for 40 years.  (Ex. A, Butters Dep. at 44:11-45:11.)  But in his report, he dismisses the mark as "weak," "descriptive," and "little more than a vague, laudatory term" that "just doesn't mean very much."  (Ex. B, Butters Rpt. at 26-27.)  Dr. Butters does not explain how the same trademark can be both "venerable" (*i.e.,* famous) and "semantically weak."

**2.      Dr. Butters' comparisons to other uses of "total" are inapposite**

To demonstrate how "total" is used in the commercial context, Dr. Butters cites examples of "many different grocery store products," including "Total Snow Leopard MacWorld Superguide," "Total Wine and More," and "Total Gym." (*Id.* at 27-28.)  But none of these examples are "grocery store products," as he concedes.   (*See* Ex. A, Butters Dep. at 125:10-17.)  Moreover, in each of these examples, "total" is used – to borrow Dr. Butters's phrase – simply to "laud" the completeness of a product or service.  By contrast, Fage and General Mills both use "TOTAL" as the name of the product itself, and not as an "amplifier" of some other word or phrase.  Dr. Butters cites no other instance of "Total" standing on its own as a product name; in all of his examples, "total" is just a modifier.

**3.      Dr. Butters ignores the empirical evidence of consumer confusion**

Dr. Butters declares it "inconceivable" that a consumer familiar with General Mills' TOTAL mark "would purchase FAGE TOTAL Greek stained yogurt … simply because the product name shown on the yogurt package contained the phonologically, orthographically, and semiotically unobtrusive word *total*."  (Butters Rpt., Ex. B at 24.)  And yet, the survey conducted by Dr. Alex Simonson demonstrates actual consumer confusion of precisely this nature.  Dr.

Butters may quarrel with Dr. Simonson's survey design and methodology, but he may not make such a categorical pronouncement without engaging the evidence to the contrary.  That he did so is further evidence of his *ipse dixit*, "because-I-said-it" approach.

In sum, Dr. Butters's opinions and testimony lack the indications of reliability that would vouchsafe their admissibility under *Daubert* and Rule 702.  They should therefore be excluded in their entirety.

## II.   BUTTERS'S TESTIMONY INVADES THE JURY'S PROVINCE.

Dr. Butters understands that the "likelihood of consumer confusion" is the centerpiece of every trademark dispute.  *See Mushroom Markers, Inc. v. R.G. Barry Corp.*, 580 F.2d 44, 47 (2d Cir. 1978) ("It is well settled that the crucial issue in an action for trademark infringement … is whether there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question").  If permitted to testify, he would tell the jury that:

- "the cumulative effect of the linguistic features that distinguish the function of the word *total* [in the parties' trademarks] … far outweighs any features that would lead to linguistic confusion;"  (Ex. B, Butters Rpt. at 4)

- "FAGE's use is simply too unobtrusive to create such confusion;"  (*Id.* at 8)

- "[T]he semiotics of packaging will prevent a likelihood of confusion or mistake among consumers;" (*Id.* at 13)

- "[I]t is unlikely that [the] consumer would confuse FAGE's use with the semantically weak common word *total* as used by GENERAL MILLS;" (*Id.* at 27)

- "[C]onsiderations of the communicative context … compel the conclusion that the likelihood of linguistic confusion of the two companies' use of *total* is highly unlikely;" (*Id.* at 30) and finally,

- "[L]inguistic confusion is unlikely for consumers of yogurt and cereal." (*Id.* at 30-31.)

If the jury credited each of these statements, its work would be done; there would be no material issues left to resolve.  For exactly this reason, Dr. Butters's testimony must be excluded.

     "When an expert undertakes to tell the jury what result to reach, this does not aid the jury in making a decision*,* but rather attempts to substitute the expert's judgment for the jury's." *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994).  Dr. Butters claims that he seeks merely "to be of use to the trier of fact" (Ex. 1, Butters Dep. at 54:4-6), but his blunt pronouncements betray a far more intrusive purpose.  When Dr. Butters asserts that "ordinary reasonable speakers of American English" are unlikely to be confused, he is telling the Court – and, he hopes, the jury – that anyone who believes otherwise is neither ordinary nor reasonable.  In so doing, he crosses the line between permissible opinion testimony on material fact issues, and prohibited instruction on the ultimate issue in the case.  *See Nimely v. City of New York*, 414 F. 3d 381, 398-99 (2d Cir. 2005) (Excluding expert testimony that "essentially instructed the jury as to an ultimate determination that was exclusively within its province"); *see also Bausch & Lomb, Inc. v. Alcon Labs, Inc.*, 79 F. Supp. 2d 252, 259 (W.D.N.Y.  2004) (barring expert testimony because "whether [the party] engaged in unfair competition is well within the ken of a properly-instructed jury to decide") and *Candlehouse, Inc. v. Town of Vestal*, No. 3:11-CV-0093, at *22 (DEP), 2013 WL 1867114 (N.D.N.Y. May 3, 2013) (Ex. E) ("While it is true that Rule 704 of the Federal Rules of Evidence does not automatically preclude testimony from an expert on an ultimate issue

such as this, the Second Circuit has unequivocally held that, despite Rule 704, trial experts may not opine on such an ultimate issue") (citation omitted).  Because Dr. Butters would usurp the jury's role, his opinions and testimony should be excluded.

While Dr. Butters clearly cannot urge jurors to adopt his view over their own, it is less clear whether his testimony can help the jury at all.  Testimony is properly characterized as "expert" only if it concerns subjects that the average juror cannot understand on his or her own. *See United States v. Amuso,* 21 F.3d 1251, 1263 (2d Cir. 1994) ("A district court may commit manifest error by admitting expert testimony where … the subject matter of the expert's testimony is not beyond the ken of the average juror"); *United States v. Mejia*, 545 F.3d 179, 194-95 (2d Cir. 2008) (excluding expert testimony that "concerned material well within the grasp of the average juror").  Here, the question for the jury is "whether there is any likelihood that an appreciable number of *ordinarily prudent purchasers* are likely to be misled, or indeed simply confused, as to the source of the goods in question."  *Mushroom Makers*, 580 F.2d at 47 (emphasis added).  Jurors are presumptively able to understand the viewpoint of "ordinarily prudent purchasers" without guidance from trained experts.  *See, e.g., Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 644 (S.D.N.Y. 2007) ("Jurors … can see for themselves…. There is no need for an expert to tell them what they can see"); *Automobile Ins. Co. of Hartford v. Electrolux Home Prods.*, No. 08-CV-00623(A)(M), 2011 WL 1434672, at *1 (W.D.N.Y. Mar. 24, 2011) (Ex. F) (excluding expert testimony as unnecessary because "the proper use and operation of a clothes drier is sufficiently within the 'ken of laymen'").

Indeed, at least two courts have cited this truism as a basis for disregarding a linguist's testimony on consumer confusion.  In *Infinity Broad. Corp. v. Greater Boston Radio, II, Inc.*, the

13

trial court noted that "[I]t is far from clear that this is a subject on which the expert testimony of a linguist is useful[;]"

> After all, the subject on which the linguist is opining is whether the letters "WBCN" and "WBCS" sound so much alike that an average listener, upon hearing one set, will mistakenly think that he or she has heard the other. Any person with average hearing ability, including the author of this opinion, is presumably as qualified as a linguist to make this determination.

*Infinity Broad. Corp. v. Greater Boston Radio, II, Inc.*, Civ. A. No. 93-11161-WF, 1993 WL 343679, at *6 (D. Mass. Aug. 18, 1993) (Ex. G).  Similarly, in *Virginia Tech Found. Inc. v. Family Group Ltd. V*, the court expressed consternation that both sides' expert linguists "did more to obfuscate the problem than they did to clarify it[:]"

> They undertook to describe in technical and polysyllabic jargon that which is obvious to the ordinary person with reasonably good vision and hearing. They undertook to tell me that the four letters in the call letters of the two stations either did or did not look alike and sound alike. In my judgment, this is a classic misuse of expert testimony, and I give very little weight to any of it.

*Virginia Tech Found. Inc. v. Family Group Ltd. V*, 666 F. Supp. 856, 858 (W.D.Va. 1987).  Thus, if it were to grant this motion, the Court would not be first to uphold jurors' innate ability to understand the perspective of "ordinarily prudent purchasers" without the aid of a linguist.

III.    **BUTTERS'S   TESTIMONY   IS   IRRELEVANT,   CUMULATIVE,   AND MISLEADING.**

    A.    **Butters's Linguistic Analysis Does Not "Fit" the "Ordinarily Prudent Purchaser" Standard.**

To the extent that Dr. Butters's testimony actually draws from linguistic science – and not merely his own shopping experiences and his assumptions about others' – his perspective is far removed from that of the "ordinarily prudent purchaser" and irrelevant to the central issue in the case.  As courts in similar cases have observed, "ordinarily prudent purchasers" do not apply linguistic expertise to their buying decisions.  *See*, *e.g.*, *Malaco Leaf AB v. Promotion in Motion, Inc.*, 287 F. Supp. 2d 355, 371–72 (S.D.N.Y.2003) (rejecting linguistics expert because his testimony was irrelevant to how "consumers in the marketplace actually hear and view" the marks); *Le Blume Import Co. v. Coty*, 293 F. 344, 358-359 (2d Cir. 1923) (foreign word could be trademarked, even though a linguist would consider it descriptive, because it was unintelligible to ordinary consumers); *Stix Prods., Inc. v. United Merchants & Mfrs., Inc.,* 295 F.Supp. 479, 489 (S.D.N.Y. 1968) ("That stress patterns in a compound phrase may convey generic meaning to a linguist, a scientific language expert, does not necessarily make the phrase generic as far as the consuming public is concerned").  Thus, if Dr. Butters truly offers linguistic insights that are "beyond lay ken," his testimony should be excluded for failing to "fit" the material issue in the case – whether ordinary consumers are likely to be confused by Fage's use of the word "TOTAL" as the name of its product.  *See Daubert,* 509 U.S. at 594-905.

    B.    **Butters's Opinions Are Cumulative of Fage's Other Experts' Testimony.**

While a consumer survey is not a *sine qua non* for proving trademark infringement, courts have generally found survey evidence to be more probative than personal anecdotes as evidence of consumer confusion.  *See, e.g., Star Indus., Inc. v. Bacardi & Co. Ltd.*, 412 F.3d 373,

388 (2d Cir. 2005) (consumer surveys outweigh anecdotes as evidence of actual confusion); *see also Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 646 (S.D.N.Y. 2007) ("Through a reliable survey, jurors receive information that is central to their task) and *Herman Miller v. Palazzetti Imports & Exports*, 270 F.3d 298, 312 (6th Cir. 2001) ("Because the determination of whether a mark has acquired secondary meaning is primarily an empirical inquiry, survey evidence is the most direct and persuasive evidence").  Fage intends to offer survey evidence at trial through the testimony of Itamar Simonson, among others.  While General Mills disputes the validity of Dr. I. Simonson's methodology and conclusions, his survey represents at least an attempt to gather empirical data.  By comparison, Dr. Butters's solipsistic musings are just anecdotes.  His testimony should therefore be excluded under Fed. R. Evid. 403 as cumulative, at best, of the survey evidence Fage will proffer.

### C.   The Potential for Butters's Testimony to Mislead Outweighs Its Probative Value

"Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it," and for that reason, the Court "exercises more control over experts than over lay witnesses."  *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 566, 569 (S.D.N.Y. 2007) (quoting *Daubert*).  Dr. Butters is an expert in linguistics, but his credentials only heighten the danger that the jury will be misled by his testimony – especially when the jury's task demands nothing more than the straightforward viewpoint of the "ordinarily prudent purchaser."  His testimony should therefore be excluded under Rule 403.  *See Candlehouse, Inc. v. Town of Vestal*, 2013 WL 1867114 (N.D.N.Y.) ("whatever minimal relevance Dr. Bransford's opinions … may carry, that probative value is substantially outweighed by the risk of confusion to the jury when considering her opinions, and attempting to reconcile them with the facts of this case").

## <u>CONCLUSION</u>

"In assessing the reliability of an expert opinion, a resort to common sense is not inappropriate." *Johnson Elec. N. Am. Inc. v. Mabuchi Mot. Am. Corp.*, 103 F. Supp. 2d 268, 285 (S.D.N.Y. 2000) (excluding economist's expert opinion as unreliable "despite its dazzling sheen of erudition").  In this case, the jury's common sense should be enough without Dr. Butters's linguistic analysis.  For this and all of the foregoing reasons, General Mills respectfully requests that its Motion to Exclude the Testimony and Opinions of Ronald R. Butters, Ph.D. be granted in its entirety.

Dated:  June 4, 2013                                  Respectfully submitted,


                                                      /s/ David L. Nocilly
Jerry W. Blackwell (*pro hac vice*)                   David L. Nocilly, 510759
Benjamin W. Hulse (*pro hac vice*)                    BOND, SCHOENECK & KING, PLLC
BLACKWELL BURKE P.A.                                  One Lincoln Center
431 South Seventh Street, Suite 2500                  Syracuse, New York 13202-1355
Minneapolis, Minnesota  55415                         Telephone:  (315) 218-8000
Telephone:  (612) 343-3200                            dnocilly@bsk.com
blackwell@blackwellburke.com
bhulse@blackwellburke.com                             Timothy M. Kenny (*pro hac vice*)
                                                      FULBRIGHT & JAWORSKI L.L.P.
                                                      2100 IDS Center
                                                      80 South Eighth Street
                                                      Minneapolis, Minnesota 55402
                                                      Telephone: (612) 321-2800
                                                      tkenny@fulbright.com

                                                      *Attorneys for Defendants General Mills, Inc.*
                                                      *and General Mills IP Holdings II, LLC*

# APPENDIX TO MEMORANDUM OF LAW

## (DECISIONS EXCLUSIVELY REPORTED ON COMPUTERIZED DATABASES)

2001 WL 864272
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

Kristi L. MATTHEWS, Plaintiff,

v.

FIRST REVENUE ASSURANCE, L.L.C., Defendant.

No. 00 C 3711.   |   July 31, 2001.

**Opinion**

***MEMORANDUM OPINION AND ORDER***

KENNELLY, J.

 **\*1**  Kristi Matthews received a letter from First Revenue Assurance indicating in large, bold letters "THIS IS A DEMAND FOR PAYMENT IN FULL." Three paragraphs followed, all in much smaller type. The first advised that U.S. Bank had assigned Matthews' account to First Revenue Assurance for collection of the total amount owed, $5,723.13. The second told Matthews "unless you notify this office within 30 days after receiving this notice that you dispute the validity of this debt or any portion thereof, this office will assume that this debt is valid." The third paragraph said, "[p]lease submit payment in the enclosed envelope for proper credit or contact our office today to set up an autopay for immediate credit to your account."

The record contains some evidence that Matthews disputed the validity of the debt, though she appears to have done so by telephone and it is unclear whether she did so during the 30 days after she received the letter quoted above. But in any event, she neither mailed payment in the enclosed envelope nor contacted the office to set up an autopay. Ultimately she sued, alleging that FRA's letter violates § 1692g of the Fair Debt Collection Practices Act, which requires debt collectors to include in collection letters a "validation notice" telling the recipient that she has 30 days to dispute the validity of the debt, in whole or in part, and that if she does not dispute the debt, the collector may assume it to be valid. 15 U.S.C. § 1692g(a). Matthews concedes that FRA's letter contains the required validation notice. But she argues that the language in the third paragraph of the letter overshadows, contradicts and renders ineffective that notice, leaving an unsophisticated consumer like her confused as to her rights under the FDCPA.

FRA moved to dismiss Matthews' complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim; the Court denied the motion but advised the parties that it would treat the motion as one for summary judgment. Matthews responded to the motion and filed a cross motion for summary judgment, which she supported with her own deposition testimony and an affidavit from Allan Metcalf, a linguist and English professor who opined that the letter FRA sent to Matthews would be unreadable and confusing to the unsophisticated consumer. FRA moved to strike Metcalf's affidavit on the ground that it was inadmissible under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993). The Court advised the parties that it would take up the motion to strike with the motions for summary judgment, and all three motions are presently before the Court.

The Fair Debt Collection Practices Act requires a debt collector to include in letters to collect debts the information specified in § 1692g(a). But merely including this "validation notice" may not be enough to satisfy the obligations imposed under the FDCPA; the debt collector must also refrain from including other language that will overshadow or contradict the information contained in the notice. *See Chauncey v. JDR Recovery Corp.,* 118 F.3d 516, 518 (7th Cir.1997); *Avila v. Rubin,* 84 F.3d 222, 226 (7th Cir.1996). "A debt validation notice, to be valid, must be effective, and it cannot be cleverly couched in such a way as to eviscerate its message." *Avila,* 84 F.3d at 226.

 **\*2**  The Court grants FRA's motion to strike Metcalf's opinion. Metcalf concluded that FRA's letter "would not adequately convey to unsophisticated consumers their rights to validation of the debt." Metcalf Affidavit, ¶ 12. But this opinion is based almost entirely on the overall "readability" of the letter and thus sweeps far too broadly to be helpful. The only part of Metcalf's opinion that is focused on the issue at hand-whether the third paragraph generates confusion- is unsupported by anything other than Metcalf's *ipse dixit. Daubert* requires the Court, when faced with a proffer of expert testimony, to make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." 509 U.S. at 592-93. If neither the expert nor the proffering party discloses what reasoning and methodology led to the conclusions in the report, the Court has no way to satisfy this obligation. Accordingly Metcalf's affidavit is stricken.

FRA argues that the letter it sent to Matthews was not inconsistent or contradictory on its face; Matthews argues that it is. Neither party submitted survey evidence demonstrating how an unsophisticated consumer would have reacted to the letter-understandable given the cost of obtaining such evidence; in fact, FRA submitted nothing and we have largely dismissed what Matthews submitted. So we are left with just the letter itself and must decide whether its language would leave an unsophisticated consumer-that is, an uninformed, naive, trusting person-confused as to what her rights are under the FDCPA. *See Avila,* 84 F.3d at 226; *Chauncey,* 118 F.3d at 519.

Before turning to the specific language of the letter, we first consider whether summary judgment is even appropriate in this case. *Bartlett v. Heibl,* 128 F.3d 497, 501 (7th Cir.1997), suggests that it is. In that case the court, in an opinion by Judge Posner, held that "[a]lthough the question whether a dunning letter violates the Fair Debt Collection Practices Act does not require evidence that the recipient was confused-or even, as we noted earlier, whether he read the letter-the issue of confusion (or, more precisely, of 'confusingness') is for the district judge to decide...." The court found that the letter Bartlett received was, on its face, confusing and therefore reversed the entry of judgment in the debt collector's favor and remanded the case, directing the district judge to enter summary judgment in Bartlett's favor. *Id.* at 501, 502.

On the other hand, *Walker v. National Recovery, Inc.,* 200 F.3d 500 (7th Cir.1999), suggests that summary judgment, especially when based solely on the letter itself, is not appropriate. There, the court held that "[w]hether a given message is confusing is ... a question of fact, not of law or logic." *Id.* at 503. Although *Walker* involved an appeal from a ruling on a motion to dismiss, the court suggested that in some cases-namely where the plaintiff attaches a copy of the allegedly confusing letter to her complaint-the district court may treat the motion to dismiss as one for summary judgment and require the plaintiff to come forward with proof." *Id.* at 504 (emphasis added). The suggestion appears elsewhere as well: "if a plaintiff who files a formally sufficient complaint does nothing to back it up ... the district court may enter judgment on the pleadings...." *Id. Johnson v. Revenue Management Corp.,* 169 F.3d 1057 (7th Cir.1999), cited approvingly in *Walker,* also suggests that summary judgment would be inappropriate if based solely on the allegedly confusing letter. The court there noted that in deciding whether a given letter is confusing, "the judge may need to receive evidence ... [which] might include the kind of

surveys used to measure confusion in trademark cases." *Id.* at 1060. The court also held that "[i]f all the plaintiffs have to go on is the language of these letters, they must lose in the end." *Id.*

**\*3** *Pettit v. Retrieval Masters Creditors Bureau, Inc.,* 211 F.3d 1057 (7th Cir.2000), reinforces the notion that a plaintiff must come forward with additional evidence to survive summary judgment. There the Court affirmed a grant of summary judgment in the debt collector's favor because the plaintiff debtor "merely speculate[d] about how a naive debtor would interpret the letter" she received. *Id.* at 1061. The court held that a debtor hoping to avoid summary judgment on the issue of confusion "must offer sufficient evidence"-such as survey evidence-that a significant fraction of the population would have been confused after reading the letter; the debtor's own self-serving testimony that she was confused would not be enough to defeat an otherwise proper summary judgment motion. [1] *Id.* at 1061-62. Significantly, the letter at issue in *Pettit* was not inconsistent or contradictory on its face; the letter, dated August 12, 1997, advised the debtor that "[i]t is essential that you mail payment in full by 09/12/97"-a date thirty days out. Thus the plaintiff's only shot at demonstrating confusingness would have to come from evidence other than the letter itself.

Reconciling *Pettit, Johnson* and *Walker* with *Bartlett* and *Avila* is no easy task. But in the final analysis, we think it would be a mistake to read the Seventh Circuit's more recent cases as establishing a rule that a defendant is always entitled to summary judgment in an "overshadowing" case unless the plaintiff can come up with evidence beyond the letter itself. This may be so when, as in *Pettit, Johnson* and *Walker,* the letter is not contradictory on its face; in that situation the plaintiff must produce independent evidence of confusion or face defeat. But when, as in *Bartlett* and *Avila,* the judge determines that the letter is confusing on its face (where, for example, the language of the letter is patently contradictory or inconsistent), summary judgment in the *plaintiff's* favor may still be appropriate, though summary judgment in the *defendant's* favor would not be. This makes sense in light of the lens through which we are supposed to view these things: if a letter is confusing to a federal judge, it is necessarily confusing to an unsophisticated consumer; on the other hand, as Judge Easterbrook noted, "what seems pellucid to a judge, a legally sophisticated reader, may be opaque to someone whose formal education ended after sixth grade." *Walker,* 200 F.3d at 501. With this in mind, we analyze the language of the letter FRA sent Matthews.

In deciding whether FRA's letter is confusing, we find good counsel in the cases discussed above. The letters scrutinized in *Johnson* both contained a paraphrase of the statutory validation notice, but neither stopped there. One of the letters added: "If you fail to make prompt payment we will have no alternative but to proceed with collection.... Should you wish to discuss this matter, contact our office and ask for extension 772." 169 F.3d at 1059. The second followed the validation notice with: "[your] account has been placed with our firm for payment in full. Call our office immediately upon receipt of this letter." *Id.* The letter at issue in *Walker* similarly included the statutory validation notice. But the letter also advised the recipient that the account had been placed with the defendant "for immediate collection" and requested that the recipient "[p]lease remit PAYMENT IN FULL with this letter to the address above.... If you have any questions concerning your account please contact me at my office." 200 F.3d at 502. Judge Easterbrook, who coincidentally authored both opinions, noted that neither debt collector had attempted to explain how (as in *Johnson* ) a demand for prompt or immediate action or (as in *Walker* ) immediate collection, which presumably involved immediate payment, could be reconciled with the statutory 30-day period. *See Johnson,* 169 F.3d at 1059; *Walker,* 200 F.3d at 502. But none of these letters was patently inconsistent on its face; that is, none of these letters actually requested payment or an action that would necessarily lead to payment within a time frame falling within the 30-day statutory period.

 **\*4** Conversely, in *Bartlett,* the letter at issue told the debtor that if he wished to avoid legal action "you must do one of two things within one week of the date of this letter: (1) Pay $316.00 ... or, (2) Contact MICARD SERVICES ... and make suitable arrangements for payment." 128 F.3d at 503 (emphasis added). This letter, unlike those at issue in *Johnson* and *Walker* did name a deadline involving payment that was, without question, within the 30-day period; not even the most tortured interpretation could extend "within one week" to a time beyond the 30-day window. *Avila* presented the same situation: after the validation notice the letter in that case told that "[i]f the above [the validation notice] does not apply to you, we shall expect payment or arrangement for payment to be made within ten (10) days from the date of this letter." 84 F .3d at 226 (emphasis added). The Seventh Circuit held that this language was "entirely inconsistent" with the validation notice and affirmed the district court's grant of summary judgment in favor of the debtor on the issue of liability. *Id.* at 226.

We think the letter FRA sent to Matthews bears a closer resemblance to the letters at issue in *Bartlett* and *Avila* than to the letters at issue in *Walker* and *Johnson.* FRA's letter, like the defendants' letter in *Bartlett,* asks the debtor to pay or arrange for payment on a day ("today") that is, without question within the 30-day period; not even the most tortured interpretation can extend "today" beyond the 30-day period. As in *Avila,* FRA's directive to submit payment or call today is "entirely inconsistent" with the required validation notice. Accordingly, no further evidence of confusion is required. We therefore grant summary judgment on the issue of liability in Matthews' favor.

In support of its position, FRA submitted an order entered May 30, 2001 in *England v. First Revenue Assurance* (Case No. CY-00-3011-FVS), in which a district court judge in the Eastern District of Washington, on essentially the same facts, concluded that FRA's letter does not violate the FDCPA. The court entered summary judgment in favor of FRA and dismissed the plaintiff's claims because "even the least-sophisticated consumer would be unlikely to construe the phrase 'set up an autopay' as a demand to make payment within 30 days." Order, p. 5. The Court cannot agree. FRA's letter requests or demands (the distinction is meaningless for our purposes) that the debtor either pay the amount due or "contact our office today to set up an autopay for immediate credit to your account." (emphasis added). Nothing in this language suggests "a relationship that will last for an extended period of time," *see England* Order, p. 5; on the contrary this language can be reasonably interpreted only one way: it is a request for an immediate phone call to arrange payment within the statutory period. Accordingly the Court is not persuaded that following the *England* court's lead is the right move.

## CONCLUSION

 **\*5** For the reasons explained above, the Court finds that the collection letter sent by FRA to Matthews is confusing on its face and therefore violates the FDCPA. Accordingly, the Court denies FRA's motion for summary judgment, and grants Matthews' cross motion for summary judgment [14-1] on the issue of liability. Additionally the Court grants FRA's motion to strike Allan Metcalf's affidavit [17-1]. The case is set for status on Thursday August 9, 2001 at 9:30 a.m.

Footnotes

1     *Pettit* suggests that Matthews' deposition testimony should play at best a limited role in our analysis. As we will explain, we need
      not consider it anyway; our decision is supported by the language of the letter itself.

2013 WL 1867114
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

CANDLEHOUSE, INC., Plaintiff,

v.

TOWN OF VESTAL, NEW YORK, Defendant.

Civil Action No. 3:11–CV–
0093 (DEP).    |    May 3, 2013.

**Attorneys and Law Firms**

American Center for Law and Justice, Abigail Southerland, Esq., Larry L. Crain, Esq., Carly F. Gammill, Esq., David A. French, Esq., Brentwood, TN, Hinman, Howard & Katell, LLP, Dawn J. Lanouette, Esq., Sarah G. Campbell, Esq., of Counsel, Binghamton, NY, for Plaintiff.

Ahmuty, Demers & McManus, Robert J. Hindman, Esq., Agnieszka A. Wilewicz, Esq., David S. Berger, Esq., Riverhead, NY, for Defendant.

**Opinion**

***DECISION AND ORDER***

DAVID E. PEEBLES, United States Magistrate Judge.

**\*1** Plaintiff Candlehouse, Inc. ("Candlehouse"), the owner of residentially zoned property located in the Town of Vestal, New York ("Town"), has commenced this action against the Town based upon the refusal of the its Code Enforcement Officer and Zoning Board of Appeals to find that plaintiff's anticipated use of the property, as a Christian faithbased residential treatment facility for young women struggling with addiction or emotional disorders, is a permitted use of the property under the Town's zoning ordinances.[1] In its complaint, Candlehouse asserts that the Town's refusal to allow its intended use of the property violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, and the Fair Housing Act ("FHA"), 42 U.S.C. § 3601. Plaintiff also alleges that the Town's restriction on its use of the premises constitutes an unlawful burden on its residents' religious exercise, in violation of the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc(a).

Currently pending before the court are the parties' cross motions for summary judgment. In addition, plaintiff has applied for the issuance of sanctions based upon defendant's alleged destruction of or failure to produce relevant evidence, and to strike the report of defendant's retained expert and preclude her from testifying at trial. For the reasons set forth below, I conclude that the defendant is entitled to the entry of summary judgment dismissing plaintiff's disparate impact claim under the ADA and the FHA, and its RLUIPA cause of action, but that the existence of material disputes of fact preclude the entry of summary judgment in either party's favor with regard to plaintiff's intentional discrimination and reasonable accommodation claims under the ADA and FHA. In addition, I conclude that plaintiff's application for the issuance of sanctions is not yet ripe for determination, and that defendant's expert is precluded from testifying at trial with regard to several of the conclusions included in her report.

**I. *BACKGROUND***

Plaintiff, which operates as Candlehouse Teen Challenge, is a Christian non-profit organization whose avowed function is "to restore individuals who struggle with life controlling problems such as alcohol abuse and/or who struggle with emotional disorders." Dkt. No. 70 at ¶ 3. According to its mission statement, Candlehouse's purpose is to permit its residents "to live life together with freedom, peace and joy." Dkt. No. 70–2 at 1. Candlehouse is one of 234 accredited Teen Challenge programs operating nationwide, utilizing a program pioneered in 1958 by Rev. David Wilkerson. Dkt. No. 68–2 at ¶¶ 3,5. Candlehouse has operated as a Teen Challenge-affiliated residential center in New York for more than seventeen years, and for eight years prior to that as a non-affiliated center, assisting women to recover from the negative impacts of substance abuse and emotional disabilities. Dkt. No. 70 at ¶ 5. While students eligible for participation in the Candlehouse program who struggle with substance abuse are no longer chemically dependent, "they have demonstrated an inability to live independently and abstain from addiction in the long-term and/or live without support as a result of an emotional disability or illness." *Id.* at ¶ 12.

**\*2** Students who enroll in the program typically reside at a Candlehouse facility between twelve and thirty-six months, depending upon their needs. Dkt. No. 70 at ¶ 9. During their stay, the students live in a family-like environment, in which they experience a daily regimen of activities that include Bible study, life skills classes, work assignments, community projects, religious worship, and free time. *Id.* at

¶¶ 10, 15. The goal of the Candlehouse program is to restore students suffering from the disabling affects of addiction or mental health issues to a point where they are capable of living independently, finding and maintaining employment, mending relationships with family members, and caring for themselves. *Id.* at ¶ 7.

Students enrolled in the Candlehouse program live, sleep, cook and eat together, and spend much of their days interacting with other students. Dkt. No. 70 at ¶ 17. The operators of Candlehouse prefer to locate the program's facilities in residential neighborhoods. *Id.* at ¶ 18. According to Candlehouse's director, Richard Mecklenborg, being situated in a residential neighborhood allows participating students to go outdoors, and motivates them to abstain from drug or alcohol abuse. *Id.* at ¶¶ 19, 20.

In or about September 2008, Candlehouse purchased from the Episcopal Diocese of Syracuse two properties located at 400 Mirador Drive and 401 Mirador Drive, Vestal, New York ("Mirador property"). For the last fifty years, the Mirador property had been utilized as a church and accompanying church campus. Dkt. No. 70 at ¶ 24. Candlehouse's intent in acquiring the Mirador property was to combine its residential campus and work training programs with the religious component of the Teen Challenge programs, which includes Bible study and other classes. *Id.* at ¶ 22. It was contemplated that the residential program would support up to twelve students, plus two staff employees and a housemother. *Id.* at ¶ 25.

The Mirador property is located in a portion of the Town of Vestal designated as RA–1 residential district for zoning purposes. Dkt. No. 61 at ¶ 12. In pertinent part, Article IV, Section 25–151 of the Town's Zoning Code permits the following uses for such properties:

Boarding and/or rooming house providing accommodations, for not more than two (2) transient roomers, provided that off-street parking requirements can be met ...

Church and other place of worship, including Sunday school building and rectory, provided said lot has a minimum frontage of one hundred fifty (150) feet, a minimum depth of one hundred fifty (150) feet, and contains a minimum of twenty-two thousand five hundred (22,500) square feet ...

Cultivation of plants and plantings when conducted by the occupants of the premises and incidental to the principal use ...

One-family detached dwelling ...

One-family detached modular home ...

Park, playground and other open recreational area when operated by the town ...

 **\*3**  Public elementary or secondary school; parochial school ...

Temporary structure incidental to the development of land or to the erection of a permanent structure[.]

Dkt. No. 60–1 at 10. That same provision prohibits, *inter alia,* the following uses in RA–1 residential districts:

Boarding house or rooming house ...

Boarding and/or rooming house providing accommodations for not more than four (4) nontransient roomers and provided that off-street parking requirements are met ...

Eleemosynary institution ...

Multiple family dwelling ...

Nursing or convalescent home or sanitarium ...

Two-family dwelling or modular home[.]

*Id.*

On September 23, 2008, Mecklenborg approached Mark Dedrick, the Town's Code Enforcement Officer ("CEO"), to discuss Candlehouse's interest in the Mirador property, and inquire as to whether it would be permitted to use the property as a church and residence for its students in light of the fact that the property is zoned as RA–1 residential. Dkt. No. 70–1. The next day, Mecklenborg sent a letter to Dedrick indicating that the proposed use of the property was "to continue to use it as a church," and that Candlehouse's "regular services ... offer women a temporary residence with counseling." Dkt. No. 70–1. In response, Dedrick wrote Mecklenborg a letter dated September 30, 2008, requesting additional information and advising Mecklenborg that temporary housing is not permitted in an RA–1 zoned district. Dkt. No. 61–2 at 2.

On October 12, 2008, Mecklenborg again wrote a letter to Dedrick providing the requested details concerning Candlehouse's proposed use of the Mirador property. Dkt. No. 61–3 at 2. More specifically, Mecklenborg explained that "temporary residents" could be anticipated to stay an average of thirteen months, and live together with three or more assigned to each bedroom. *Id.* at 2, 5.

On December 17, 2008, the Vestal Town Board discussed the proposed use of the Mirador property by Candlehouse during a public meeting. Dkt. No. 69–7. In that meeting, the Town's attorney stated that Candlehouse's proposed dormitory living quarters would be inconsistent with the RA–1 zoning regulation. *Id.* at 3. Following that meeting, residents in the neighborhood surrounding the Mirador property began to voice their concerns over Candlehouse's proposed use. Dkt. No. 70 at ¶ 28; Dkt. No. 70–3. In an effort to assuage those concerns, Candlehouse held a neighborhood meeting on December 22, 2008, for the purpose of providing attendees with information concerning the contemplated use. Dkt. No. 70 at ¶ 29; Dkt. No. 70 Exh. E (traditionally filed, not electronically filed). At that meeting, both supporters and opponents to the proposed use spoke, although there was significantly more opposition than support voiced for the program. Dkt. No. 70 Exh. E (traditionally filed, not electronically filed). Four members of the Vestal Town Board attended that neighborhood meeting. Dkt. No. 69–3 at 5.

**\*4** The topic of Candlehouse's plans for the Mirador property arose again during a Vestal Town Board meeting, held on January 14, 2009. Dkt. No. 69–8. At that meeting, five Town residents spoke out against the proposed use. *Id.*

On January 21, 2009, Sara G. Campbell, Esq., an attorney for Candlehouse, wrote to CEO Dedrick, stating that her client proposed to use the Mirador property as a church and rectory only, defining rectory as "a residence for church personnel." Dkt. No. 61–4 at 2. By letter dated February 5, 2009, Dedrick responded to Attorney Campbell by indicating that, while use as a church was consistent with the property's RA–1 residential district zoning, the proposed use as a residence with twentyfour hour, supervised, community-living accommodations and parentalstyle leadership for students, did not qualify as a rectory. Dkt. No. 61–5.

On February 6, 2009, Attorney Campbell again wrote to Dedrick, claiming that Candlehouse's proposed use of the Mirador property constituted a "family/functional equivalent of a family under the Town of Vestal Code." [2] Dkt. No. 69–2.

Dedrick responded by letter dated February 11, 2009, explaining that how, in his view, Candlehouse's proposed use does not comport with any of the seven definitional paragraphs provided for in the Town's zoning Code related to family. Dkt. No. 61–7. He concluded by stating that "the definition within the context of the Code of the Town of Vestal does not allow me to affirm that the Candlehouse use, as presented in written and oral information meets the criterial of a family." *Id.* at 3.

On March 25, 2010, the Town's Zoning Board of Appeals ("ZBA") entertained an appeal by Candlehouse concerning its proposed use of the Mirador property. [3] Dkt. No. 78–4. During the ZBA hearing, Candlehouse representatives made a presentation concerning their proposed use of the Mirador property and were questioned by ZBA members regarding Candlehouse's program. Dkt. No. 78–4 at 5–53. Time was then allotted for public comments, of which there were many. *Id.* at 55–70. Following that hearing, the ZBA issued a decision, dated May 10, 2010, unanimously concluding that Candlehouse does not meet the definition of the functional equivalent of a family, and setting out the reasoning for the its determination. Dkt. No. 70–5. In its decision, the ZBA considered and applied the attributes of a family as set out in the governing ordinance, concluding that (1) the proposed assembly of students does not resemble a traditional family unit; (2) it is anticipated that the group will live and cook together as a single housekeeping unit; (3) Candlehouse students are anticipated to be transient in nature, rather than permanent, entering and leaving as they are either rehabilitated or expelled; and (4) the proposed bedroom would not be a "conventional" bedroom but instead would contain rows of bunks for all students in one large room. *Id.* at 5–6.

On May 5, 2010, through counsel, Candlehouse argued to the Town Board that its program is protected by the FHA and ADA, and formally requested that the Town make a reasonable accommodation to its zoning rules and policies in the form of either a waiver of the family requirement, or, alternatively, an amendment of the Town's zoning ordinance to permit the desired use. Dkt. No. 69–11. The parties dispute whether, and when, the Town Board decided Candlehouse's reasonable accommodation request. [4]

**\*5** During the pendency of this action, Candlehouse has utilized the Mirador property for various church related uses. However, it has had to carry out the residential portion of its

program elsewhere, requiring that its students be transported on a daily basis to the Mirador property for programming.

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on January 26, 2011, asserting six separate causes of action. Dkt. No. 1. Because plaintiff has voluntarily dismissed three of those claims, only three remain, including (1) discrimination on the basis of handicap, in violation of the FHA; (2) discrimination based upon disability, in violation of the ADA; and (3) a substantial burden on religious exercise, in violation of the RLUIPA.[5] Dkt. No. 1 at 7–11. As relief, plaintiff's complaint seeks declaratory and injunctive relief, as well as damages, costs, and attorney's fees. *Id.* at 11–12. On February 28, 2011, issue was joined by the filing of defendant's answer, in which it generally denied plaintiff's allegations and asserted various affirmative defenses. Dkt. No. 7.

Now that discovery has closed, both parties have filed motions for summary judgment. Dkt. Nos. 59, 68. Defendant's motion seeks dismissal of all of plaintiff's claims. Dkt. No. 59. Candlehouse requests entry of partial summary judgment only with regard to its intentional discrimination and reasonable accommodation claims under the FHA and ADA. Dkt. No. 68–4 at 3. In addition, plaintiff has filed a motion to strike defendant's expert report and preclude her from testifying at trial. Dkt. No. 66. Plaintiff also seeks sanctions based upon the Town's alleged failure to produce and/or destruction of relevant evidence. Dkt. No. 64. Oral argument was conducted in connection with the parties' motions on February 14, 2013, at which time the court reserved decision on all of the motions, with the exception of defendant's motion for summary judgment on the claims voluntarily dismissed by plaintiff. Text Minute Entry Dated February 15, 2013.

## III. *DISCUSSION*

### A. *Summary Judgment Standard*

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Sec. Ins. Co. of Hartford v.*

*Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir.2004). A fact is "material" for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

**\*6** A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4; *Sec. Ins. Co.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324; *Anderson,* 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir.1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507–08 (2d Cir.2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict"). In a case such as this, where parties have interposed cross-motions for summary judgment, each motion must be independently assessed, using this standard as a backdrop. *See Light Sources, Inc. v. Cosmedico Light, Inc.,* 360 F.Supp.2d 432, 434 (D.Conn.2005).

### B. *Overview of Plaintiff's Remaining Claims: The Statutory Framework*

The claims remaining in this case allege violations of three statutory provisions. Specifically, Candlehouse alleges that the Town's actions violate the FHA and ADA, both of which prohibit discrimination in housing based upon handicap or disability. In addition, Candlehouse alleges that the Town's actions have unreasonably burdened its exercise of religion, in violation of the RLUIPA.

Under the FHA, it is unlawful "[t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a

dwelling to any buyer or enter because of a handicap[.]" 42 U.S.C. § 3604(f)(1). Discrimination is defined to include "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford [a handicapped] person equal opportunity to use and enjoy a dwelling[.]" 42 U.S.C. § 3604(f)(3)(b); *Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown,* 294 F.3d 35, 45 (2d Cir.2002) ("*RECAP*"). Similarly, Title II of the ADA prohibits discrimination on the basis of disability by public entities, providing that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132; *RECAP,* 294 F.3d at 45. Both the ADA and FHA apply to municipal zoning determinations. *RECAP,* 294 F.3d at 45–46. Discrimination is actionable under the ADA and FHA pursuant to one of three distinct theories, including (1) intentional discrimination, or disparate treatment; (2) disparate impact; and (3) failure to make a reasonable accommodation. *Tsombanidis v. W. Haven Fire Dep't,* 352 F.3d 565, 574 (2d Cir.2003).

**\*7** Plaintiff's third remaining claim arises under the RLUIPA, which provides, in pertinent part, that

> [n]o government shall impose or implement a land use regulation in a manner that imposes a substantial burden on a religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that ... institution—
>
> (A) is in furtherance of a compelling governmental interest; and
>
> (B) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc(a)(1). In a land-use context, a substantial burden is interposed when "government action ... *coerces* the religious institution to change its behavior[.]" *Westchester Day Sch. v. Vill. of Mamaroneck,* 504 F.3d 338, 349 (2d Cir.2007) (emphasis in original).

## C. *Standing*

"In every federal case, the party bringing the suit must establish standing to prosecute the action." *Elk Grove Unified Sch. Dist. v. Newdow,* 542 U.S. 1, 11, 124 S.Ct. 2301, 159 L.Ed.2d 98 (2004). Arising from the case and controversy requirement of Article III of the Constitution, "[i]n essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *see also Clapper v. Amnesty Int'l,* ‒‒‒ U.S. ‒‒‒‒, 133 S.Ct. 1138, 185 L.Ed.2d 264, (2013). The standing requirement is reflective of "an idea, which is more than an intuition but less than a rigorous and explicit theory, about the constitutional and prudential limits to the powers of an unelected, unrepresentative judiciary in our kind of government." *Allen v. Wright,* 468 U.S. 737, 750, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) (internal quotation marks omitted). To establish standing for purposes of the constitutional "case or controversy" requirement, a plaintiff must show that he personally has suffered an injury that is "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Clapper,* 133 S.Ct. at 1147 (internal quotation marks omitted). Before proceeding to the merits of the pending motions, I must first determine *sua sponte* whether plaintiff has standing to litigate the claims asserted in its complaint. [6]

For two reasons, I find that Candlehouse possesses the requisite standing necessary to pursue its claims. First, Candlehouse suffered a concrete injury when the ZBA decided that its program failed to qualify as the "functional equivalent of a family" under the relevant zoning provisions. *RECAP,* 294 F.3d at 45, n. 2. In addition, because Candlehouse's students comprise a class of individuals, all or some of whom possess discrimination claims of their own right, and those interests are closely aligned with those of Candlehouse, plaintiff also meets the requirements for organizational standing. *See id.* ("[Plaintiff] serves a class of individuals with discrimination claims; the interests at issue are germane to [the plaintiff]'s purpose; and no individual participation is required under these circumstances."). I therefore find that plaintiff has standing to litigate the claims asserted in its complaint. *Id.; see also McKivitz v. Twp. of Stow,* 769 F.Supp.2d 803, 817–18 (W.D.Pa.2010); *First Step, Inc. v. City of New London,* 247 F.Supp.2d 135, 148 (D.Conn.2003).

## D. *Disability/Handicap*

**\*8** In order to succeed under its FHA and ADA claims, plaintiff must establish that its students are "handicapped" under the FHA, or "disabled" as defined in the ADA. "To demonstrate a disability under [the FHA and ADA], a plaintiff

must show: (1) a physical or mental impairment which substantially limits one or more major life activities; (2) a record of having such an impairment; or (3) that [he is] regarded as having such an impairment." [7] *RECAP*, 294 F.3d at 46; *see also Bragdon v. Abbott*, 524 U.S. 624, 631, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998) (finding that "[t]he ADA's definition of disability is drawn almost verbatim from ... the definition of 'handicap' contained in the [FHA]").

The Supreme Court has articulated a three-step test for determining whether an individual's alleged impairment constitutes a disability or handicap under the ADA and FHA. *Bragdon*, 524 U.S. at 631; [8] *see also Colwell v. Suffolk Cnty. Police Dep't*, 158 F.3d 635, 641 (2d Cir.1998), *superseded by statute on other grounds by* 42 U.S.C. § 12102(3)(A). The first inquiry focuses upon whether the plaintiff suffers from an impairment. *Bragdon*, 524 U.S. at 631. If so, then the court must next identify any major life activity potentially limited by the impairment. *Id.* In the third step, "tying the two statutory phrases together, [the court] ask[s] whether the impairment substantially limit[s] the major life activity." *Id.*

The question of whether Candlehouse can satisfy the disability/handicap requirements of the FHA and ADA is fiercely contested between the parties. Candlehouse director Mecklenborg notes that among those served by Candlehouse are recovering drug and alcohol addicts. [9] Dkt. No. 70 at ¶ 8; Dkt. No. 70–2 at 1 (explaining that Candlehouse has assisted "hundreds of women ... to overcome emotional problems, such as anxiety and depression, and additions to drugs[,] alcohol and behaviors"). The Second Circuit has held that, while "[a]lcoholism, like drug addiction, is an 'impairment' under the definitions of a disability set forth in the FHA, [and] the ADA, ... mere status as an alcoholic or substance abuser does not necessarily imply a 'limitation' under the second part of that definition." [10] *RECAP*, 294 F.3d at 46–47 (citations omitted). "To prevail, a recovering drug addict or alcoholic must [also] demonstrate ... that this addiction substantially limit [s] one or more of his major life activities." *Buckley v. Consol. Edison Co. of New York, Inc.*, 127 F.3d 270, 274 (2d Cir.1997); *see also RECAP*, 294 F.3d at 48. As a result, plaintiff in this case is not relieved of its burden to prove each of the three elements under the ADA/FHA-disability analysis, including to (1) demonstrate that its students suffer from a mental or physical impairment, (2) identify the major life activity that has allegedly been limited by the impairment, and (3) prove that the impairment caused the limitation in the previously identified major life activity.

**\*9** This action presents a situation that is distinct from that presented in *Oxford House, Inc. v. Town of Babylon*, 819 F.Supp. 1179 (E.D.N.Y.1993), and similar cases, involving programs whose constituents all suffer from the same impairment, like alcoholism or drug addiction. In this case, Candlehouse serves women struggling with a variety of impairments. Indeed, it is abundantly clear from the record that a potential Candlehouse student need not suffer from alcoholism or drug addiction in order to qualify for admission. *See* Dkt. No. 70 at ¶ 8 ("A few students at Candlehouse are admitted because of their struggle with a mental illness or diagnosis[.]"); Dkt. No. 70–2 at 1 ("[Since its inception,] hundreds of women have been helped to overcome emotional problems, such as anxiety and depression, and addictions to drugs [,] alcohol and behaviors."). Instead, the record now before the court suggests that admission into Candlehouse depends only on whether a candidate suffers from a "life controlling issue," a phrase that is not explicitly defined anywhere in the record. *See* Dkt. No. 68–2 at ¶¶ 4, 10 (explaining that Candlehouse is an accredited Teen Challenge program, and that Teen Challenge "provides support for individuals struggling with life-controlling problems"); Dkt. No. 70 at ¶ 3 (Mecklenborg averring that "Candlehouse ... is a[n] ... organization which ... restore[s] individuals who struggle with life controlling problems such as alcohol abuse and/or who struggle with emotional disorders"); Dkt. No. 70–2 at 2 (explaining that the profile of a Candlehouse student is one who is "unable to do normal life activities").

Accordingly, by virtue of their pending motions, the parties in essence have asked the court to determine how many of Candlehouse's students must be found "disabled" or "handicapped" under the ADA and FHA in order for Candlehouse to seek relief under those statutes . [11] Plaintiff contends that the inclusion of some non-disabled students into its program does not preclude it from seeking the protections offered by the FHA and ADA. Dkt. No. 79 at 10–11 (citing *Innovative Health Sys., Inc. v. City of White* Plains, 117 F.3d 37, 48 (2d Cir.1997); *Valley Housing LP v. City of Derby*, 802 F.Supp.2d. 359, 384 (D.Conn.2011) (citing *Innovative Health Sys., Inc.*). The primary case offered by Candlehouse in support of this argument, however, is not directly on point.

In *Innovative Health Sys., Inc.,* the Second Circuit considered whether a drug rehabilitation program is protected by the ADA when some of its clients are not drug-free and, therefore, are excluded from the definition of "disability" under the ADA based upon their unlawful use of drugs. *Innovative*

*Health Sys., Inc.,* 117 F.3d at 48–49. The court held that "[a]n inevitable, small percentage of failures should not defeat the rights of the majority of participants in the rehabilitation program who are drug-free and therefore disabled under both statutes." *Id.* at 48. In this case, however, Candlehouse assists women with "life controlling issues," a term that is not defined in the record, but does not exclusively require a woman to be suffering from a condition recognized as a *per se* impairment under the definition of disability. [12] *See* Dkt. No. 70 at ¶ 8 ("A few students at Candlehouse are admitted because of their struggle with a mental illness or diagnosis[.]")

**\*10** In any event, even assuming that *Innovative Health Sys., Inc.* stands for the proposition that a mixed-population of disabled and non-disabled students would not necessarily disqualify a program sponsor from the protections of the FHA and ADA, that case held only that a "small percentage" of non-disabled participants would not deprive the organization from the benefit of those protections. *Innovative Health Sys., Inc.,* 117 F.3d at 49. The question of what constitutes a "small percentage," however, is left unanswered by the Second Circuit's decision. [13] *See generally id.*

Without further guidance from controlling authority, and in consideration of the broad remedial purposes to be achieved by the ADA and FHA, I find that, to succeed in any of its claims under those statutes, Candlehouse must establish that a majority of its students are disabled. This finding is consistent with the sparse case law that has addressed whether an organization that serves a mixed group of disabled and nondisabled participants is protected by the FHA and ADA. *See Innovative Health Sys., Inc.,* 117 F.3d at 49 (holding that, to the extent that "a small percentage" of residents at a drug rehabilitation program were not drugfree, the program was not precluded from the protections of the ADA and Rehabilitation Act); *Valley Housing LP v. City of Derby,* 802 F.Supp.2d 359, 384 (D.Conn.2011) (finding that the plaintiff was protected by the FHA, ADA, and Rehabilitation Act where it served relapsed alcoholics); *Keys Youth Svcs. v. City of Olathe, Kan.,* 52 F.Supp.2d 1284, 1297–1300 (D.Kan.1999) (holding that, because the potential residents' impairments will substantially limit one or more major life activity in "at least some" of the individuals, the plaintiff was protected by the FHA).

Having determined the threshold question of how many of Candlehouse's residents must be found disabled for it to seek protection under the ADA and FHA, the next

question is whether the record evidence supports a finding that the majority of Candlehouse's residents are disabled. In connection with the pending motions, the parties collectively have submitted only partial information concerning eleven of the 110 students that have participated in Candlehouse's program. [14] Dkt. No. 71 (sealed). Clearly, eleven of 110 is not a majority, and thus, even assuming that all eleven case files demonstrate that those students have a disability, I am unable to conclude at this juncture that the majority of plaintiff's students are disabled.

In summary, based on the record now before me, I find that there remain genuine disputes of material fact to be resolved in connection with whether Candlehouse serves a sufficient number of disabled students to extend the protections of the ADA and FHA to its program. As a result, this material threshold issue thus precludes the entry of summary judgment in favor of plaintiff on any of its ADA and FHA claims. [15]

**D. *Intentional Discrimination***

**\*11** One of the theories of discrimination advanced by Candlehouse under the ADA and FHA is the claim that the Town engaged in intentional discrimination by denying the application to have its proposed use of the Mirador property be considered the functional equivalent of a family under the Town's relevant zoning laws. Both parties seek the entry of summary judgment with respect to this claim.

Claims of intentional discrimination under the ADA and FHA are properly analyzed utilizing the familiar, burden-shifting model developed by the courts for use in employment discrimination settings dating back to the Supreme Court's decision in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *RECAP,* 294 F.3d at 48–49. Under that analysis, a plaintiff must first establish a *prima facie* case of intentional discrimination under the FHA and ADA by "present[ing] evidence that animus against the protected group was *a* significant factor in the position taken by the municipal decision-makers themselves or by those to whom the decisionmakers were knowingly responsive." *RECAP,* 294 F.3d at 49 (internal quotation marks omitted, emphasis in original). Once a plaintiff makes out its *prima facie* case, "the burden of production shifts to the defendants to provide a legitimate, nondiscriminatory reason for their decision." *RECAP,* 294 F.3d at 49. "The plaintiff must then prove that the defendants intentionally discriminated against them on a prohibited ground." *Id.* The factfinder is permitted "to infer the ultimate fact of discrimination"

if the plaintiff has made "a substantial showing that the defendants' proffered explanation was false." *Id.* (internal quotation marks omitted).

The key inquiry in the intentional discrimination analysis is whether discriminatory animus was a motivating factor behind the decision at issue. *Tsombanidis,* 352 F.3d at 579. The Second Circuit has identified the following five factors a factfinder may consider in evaluating a claim of intentional discrimination:

> (1) the discriminatory impact of the governmental decision; (2) the decision's historical background; (3) the specific sequence of events leading up to the challenged decision; (4) departures from the normal procedural sequences; and (5) departures from normal substantive criteria.

*Tsombanidis,* 352 F.3d at 580 (internal quotation marks omitted).

In this case, there is considerable record evidence reflecting that many Town residents, including members of the Town Board, were unsupportive of the prospect of Candlehouse moving into the Mirador property. [16] While potentially relevant, the intent of the Town residents is not the focus of the intentional discrimination inquiry, nor is the motivation of the Town Board, as an entity distinct from the ZBA. [17] Instead, to prevail, plaintiff must demonstrate that the decisions by the Town's CEO, Dedrick, and ZBA were discriminatorily motivated.

The record evidence now before the court discloses the existence of a sharp dispute as to whether the CEO Dedrick and ZBA were, in fact, influenced by community animus in their decisionmaking. The record does not definitively reveal the extent of interaction between members of the Town Board, some of whom were clearly opposed to the project, and CEO Dedrick, who made the initial decision to deny Candlehouse's proposal for use of the Mirador property. Town Board member Bielecki testified during his deposition that he spoke with Dedrick regarding Candlehouse on different occasions, including prior to the board meeting on December 17, 2008, and after the neighborhood meeting held on December 22, 2008. Dkt. No. 69–16 at 3, 6–7. In contrast, Dedrick denies speaking with any Town officials regarding the Candlehouse matter between at least October

12, 2008, and January 1, 2009. Dkt. No. 69–18 at 8–9; Dkt. No. 61 at ¶ 32.

**\*12** Turning to the ZBA's motivation, in his affidavit Acting ZBA Chairman Mark Tomko states that the packet of information received by the ZBA when a party appeals a decision by CEO Dedrick typically contains only the appellant's submissions, as well as any responses to those submissions from Town officials. Dkt. No. 60 at ¶ 18. He also states that "[t]his packet does not contain any letters or correspondence from town officials regarding their feelings or interpretations of the Zoning Code." *Id.* at ¶ 9. Moreover, the transcript of the ZBA's hearing on Candlehouse's appeal does not reflect that any of the ZBA board members engaged in discriminatory questioning, or were influenced by the public comments that followed the formal presentation by plaintiff and the question-and-answer period from the ZBA board members. *See generally* Dkt. No. 60–3. The ZBA board members' questions were objective in nature, and focused on the question of whether plaintiff's organization operates as the functional equivalent of a family. *Id.* at 17–54. The ZBA's written decision is facially neutral, and focuses on the zoning ordinance's definition of family. Dkt. No. 60–4. All of this evidence suggests that the ZBA was not influenced by discriminatory intent in denying plaintiff's appeal.

As a counterweight to this evidence, the record discloses that, before accepting any public comment at the ZBA hearing, Chairman Tomko acknowledged that whether plaintiff may establish itself in the area has created some "a lot of issues" for the community. Dkt. No. 60–3 at 54. Although in his affidavit Tomko attempts to distance himself and the ZBA from the community's outcry, this acknowledgment at the hearing indicates that he possessed at least some awareness of the community sentiment opposed to Candlehouse's program. The fact that the ZBA heard public comment and received letters from the public in lieu of live testimony at the ZBA hearing, and made a record of the proceeding, further suggests that the ZBA was not entirely insulated from the community's disapproval of Candlehouse. [18]

For all of these reasons, I conclude that there remain genuine disputes of material fact as to whether CEO Dedrick or the ZBA were motivated by discriminatory intent in denying Candlehouse's request to find that its program meets the functional equivalent of a family under the Town's zoning laws. As a result, the parties' motions for summary judgment, as they relate to plaintiff's intentional discrimination claim, are denied.

## E. *Disparate Impact*

Candlehouse also claims that the Town's application of its zoning ordinance and decision not to find that its proposed use of the Mirador property constitutes the functional equivalent of a family resulted in a disparate impact upon Candlehouse's disabled residents. Only defendant has moved for summary judgment with respect to this claim.

"To establish a *prima facie* case under this theory, the plaintiff must show: (1) the occurrence of certain outwardly neutral practices, and (2) a significantly adverse or disproportionate impact on persons of a particular type produced by the defendant's facially neutral acts or practices." *RECAP, 294 F.3d at 52–53* (internal quotation marks omitted). "A plaintiff need not show the defendant's action was based on any discriminatory intent." *Tsombanidis, 352 F.3d at 575*. To prove that a neutral practice has a significantly adverse or disproportionate impact "on a protected group, a plaintiff must prove the practice actually or predictably results in discrimination." *Tsombanidis, 352 F.3d at 575* (internal quotation marks and alterations omitted). In addition, a plaintiff must prove "a causal connection between the facially neutral policy and the alleged discriminatory effect." *Id.* Once a plaintiff establishes its *prima facie* case, "the burden shifts to the defendant to prove that its actions furthered, in theory and in practice, a legitimate, bona fide governmental interest and that no alternative would serve that interest with less discriminatory effect." *Id.* (internal quotation marks omitted).

**\*13**  "The basis for a successful disparate impact claim involves a comparison between two groups—those affected and those unaffected by the facially neutral policy. This comparison must reveal that although neutral, the policy in question imposes a significantly adverse or disproportionate impact on a protected group of individuals." *Tsombanidis, 352 F.3d at 575*.

"Statistical evidence is ... normally used in cases involving fair housing disparate impact claims." *Tsombanidis, 352 F.3d at 575–76*. "Although there may be cases where statistics are not necessary, *there must be some analytical mechanism to determine disproportionate impact." Id.* at 576 (emphasis added). A plaintiff may choose to undertake a "qualitative comparison" to demonstrate adverse or disproportionate impact. *Id.* at 577. This type of comparison was described in Tsombanidis in the following way:

In such a comparison, plaintiffs would have to show that the average recovering in West Haven has a greater need—qualitatively—for group living than does the average non-recovering in West Haven. This would likely require some quantification of what each group 'needs' from a living arrangement standpoint. A court could then conclude that, despite whether the quantitative test is met, there is a qualitatively disproportionate impact on recoverings in West Haven.

*Id.*

In this case, to prevail on its disparate impact claim, Candlehouse must do more than merely show that the Town's enforcement of its facially neutral zoning provisions has adversely affected its students. It must also establish, through statistics or some other reliable analytical mechanism, that defendant's neutral policy actually or predictably created a shortage of housing for the individuals served by Candlehouse's program. *See Tsombanidis, 352 F.3d at 576* (reversing district court where the plaintiff could not show that the defendant's fire code "actually or predictably created a shortage of housing for recovering alcoholics in the community"); *see also Hack v. President & Fellows of Yale Coll., 237 F.3d 81, 91 (2d Cir.2000)* (finding no disparate impact where "[t]he [plaintiffs] do not allege that [the defendant's] policy has resulted in or predictably will result in under-representation of Orthodox Jews in [university] housing"); *Huntington Branch, NAACP v. Town of Huntington, 844 F.2d 926, 933 (2d Cir.1988)* ("To establish a *prima facie* case under the disparate impact analysis, a plaintiff must prove that the challenged practice 'actually or predictably' results in discrimination.").

Here, the parties agree that the zoning ordinance at issue is facially neutral. *Compare* Dkt. No. 65 at 24 ("It is undisputed that the Town of Vestal Zoning Code provisions at issue are facially neutral[.]") *with* Dkt. No. 79 at 16 ("Here, neither party seems to dispute that Defendant's zoning ordinance defining 'family' and/or 'functional equivalent of family' appears to be an outwardly neutral law."). They are at odds, however, over whether it disproportionally affects the group of individuals served by Candlehouse. Plaintiff has not provided any statistical evidence demonstrating that potential candidates for its program suffer from a shortage of housing

as a result of defendant's policies. Nor has plaintiff undergone a qualitative comparison between that group and one that does not suffer from any of the same impairments, and evaluated whether there is a greater need of residential housing for its group of students.

**\*14** Candlehouse argues that, because a district court in New Jersey found that " 'people who are handicapped by alcoholism or drug abuse are more likely to need a living arrangement ... in which groups of unrelated individuals reside together in residential neighborhoods,' " this gives the court license to find that plaintiff has met its burden of demonstrating the requisite disparate impact caused by application of the Town's zoning laws. Dkt. No. 79 at 17 (quoting *Oxford House, Inc. v. Twp. of Cherry Hill,* 799 F.Supp. 450, 461 (D.N.J.1992)). Plaintiff has conceded, however, that not all of its students are recovering alcoholics or drug addicts. Instead, the record is clear that Candlehouse serves a mixed group of women who suffer from "life controlling issues" (which, again, is not defined), including, *inter alia,* emotional distress unrelated to drugs or alcohol use. Dkt. No. 76 at ¶¶ 9, 10; Dkt. No. 68–1 at ¶ 11. A comparison between a group of *only* alcoholics or *only* drug addicts and plaintiff's mixed population is therefore inappropriate.

Plaintiff has failed to cite, and the court has been unable to locate, any cases finding that a facially neutral ordinance has adversely or disproportionately impacted a group of individuals with varying impairments. In any event, plaintiff's complaint alleges that "several nonreligious residential treatment homes and/or group homes similar to the use proposed by [plaintiff] are located in the RA1 [,] including a home for the mentally disabled." Dkt. No. 1 at ¶ 15. Although not conclusive, this allegation suggests that there are available group homes in the relevant residential areas, in which at least some of plaintiff's students could reside. The existence of other group homes in residential areas also suggests that the facially neutral ordinance does not actually or predictably discriminate against at least some, depending on their impairment, of plaintiff's students.

I note, moreover, that plaintiff's only proof the students are in need of a "family-style residential living arrangement" to assist in "the recovery process" is the affidavit of plaintiff's director, Richard Mecklenborg. Dkt. No. 70 at ¶¶ 16, 21. That affidavit conclusorily states that a residential neighborhood allows students to spend much of their time outside, thereby providing "incentive" and "motivation" for its residents. *Id.* at ¶ 19. Importantly, however, Mecklenborg does not

explain how a location in a non-residential area precludes the students from spending the same amount of time outdoors, nor does he articulate a basis for his belief that access to the outdoors provides an incentive or motivation for Candlehouse students. *See generally* Dkt. No. 70. Indeed, there is record evidence that students are tightly restricted in their ability to go outside of the residence into the community, particularly in the beginning months after arriving. Dkt. No. 70 Exh. E (traditionally filed, not electronically filed); Dkt. No. 68–1 at ¶ 13 (explaining that students go outdoors with supervision).

**\*15** Finally, to prevail on a disparate impact claim, plaintiff must show that defendant's admittedly facially neutral ordinances predictably discriminates against plaintiff's students as a whole, and not a group of, for instance, *only* alcoholics or *only* drug addicts. Because it serves a mixed population of students, suffering from potentially diverse impairments, Candlehouse cannot establish that the facially neutral ordinance will predictably discriminate against that group, comprised of students with varying needs.

In light of the lack of statistical or other evidence reliably demonstrating a dispute of material fact regarding the existence of the required disparate impact as a result of the Town's facially neutral zoning ordinance and its application, I conclude that no reasonable factfinder could rule in favor of the plaintiff with respect to plaintiff's disparate impact cause of action.[19] Accordingly, summary judgment is granted in the Town's favor dismissing this claim.

### G. *Reasonable Accommodation*

Plaintiff has also asserted a reasonable accommodation claim under the FHA and ADA against the Town. Both parties seek the entry of summary judgment on this cause of action.

Under the FHA and ADA, "a governmental entity engages in a discriminatory practice if it refuses to make a 'reasonable accommodation' to 'rules, policies, practices or services when such accommodation may be necessary to afford a handicapped person equal opportunity to use and enjoy a dwelling.' " *Tsombanidis,* 352 F.3d at 578 (quoting 42 U.S.C. § 3604(f)(3)(B)) (alternation omitted). "Thus, these statutes require that changes be made to such traditional practices if necessary to permit a person with handicaps an equal opportunity to use and enjoy a dwelling." *Tsombanidis,* 352 F.3d at 578 (internal quotation marks omitted); *see also Millington v. Temple Univ. Sch. of Dentistry,* 261 F. App'x 363, 367, n. 5 (3d Cir.2008) ("To show discrimination

based on a failure to provide reasonable accommodations the requested accommodation not only must be reasonable; it must also be necessary, and it must not fundamentally alter the nature of the program." (citing *PGA Tour, Inc. v. Martin,* 532 U.S. 661, 681–83, 121 S.Ct. 1879, 149 L.Ed.2d 904 (2001)). "Whether or not something constitutes a reasonable accommodation is necessarily fact-specific." *Wernick v. Fed. Reserve Bank,* 91 F.3d 379, 384 (2d Cir.1996).

To prevail under a reasonable accommodation theory in this type of case, a plaintiff "must show that, but for the accommodation, [its residents] likely will be denied an equal opportunity to enjoy the housing of their choice." *Tsombanidis,* 352 F.3d at 578 (internal quotation marks omitted). "A defendant must incur reasonable costs and take modest, affirmative steps to accommodate the handicapped as long as the accommodations sought do not pose an undue hardship or a substantial burden." *Id.* In addition, "[t]he [defendant] is not required to grant an exception for a group of people to live as a single family, but it cannot deny the variance request based solely on plaintiffs' handicap where the requested accommodation is reasonable." *Id.* at 580.

 *16 In this instance, there is a dispute of material fact as to whether defendant's denial of plaintiff's request for a reasonable accommodation was based on the impairments of its students. Specifically, plaintiff alleges that, in its letter dated December 14, 2010, responding to plaintiff's request for a reasonable accommodation, defendant stated that it "was not agreeable at this time to [plaintiff's] demand." Dkt. No. 68–3 at ¶ 78. However, defendant disputes that this letter actually responded to plaintiff's request for a reasonable accommodation. [20] Dkt. No. 74 at ¶ 78. According to a letter from defendant's counsel dated May 10, 2012, it appears that defendant formally denied plaintiff's request for a reasonable accommodation in a private executive session of the Town Board. Dkt. No. 69–20 at 1. As a result, there is no direct evidence upon which I may rely in determining the motivation for the Town Board's decision to deny the requested accommodation.

In response to an interrogatory, the Town has offered the following explanation for its decision to deny plaintiff's request for an accommodation:

> The defendant has a legitimate interest in creating single-family neighborhoods comprised of singlefamily residences. The plaintiff's

proposed use of a nonconforming structure as a one family residence would cause a fundamental alteration in the zoning scheme of the town. Furthermore, the proposed use and the proposed density of such use also seems contrary to the long-standing zoning scheme involved herein. record is not clear why defendant denied plaintiff's request for a reasonable accommodation.

Dkt. No. 69–3 at ¶ 11. This rationale does not implicate the impairments of Candlehouse students as the basis for defendant's denial of the reasonable accommodation.

In contrast to this evidence, however, there is evidence that at least some of the Town Board members were biased against Candlehouse and its proposal. For example, a review of the recording of the neighborhood meeting held on December 22, 2008, demonstrates that at least two of the Town Board members spoke out against the prospect of Candlehouse moving into the neighborhood. Dkt. No. 7 Exh. E (traditionally filed, not electronically filed). Indeed, as was previously noted, one Town Board member went so far as to seemingly threaten to have the area rezoned so that Candlehouse could not move into the Mirador property. *Id.* Because there is conflicting evidence as to the basis for the Town Board's denial of plaintiff's reasonable accommodation, defendant's motion for summary judgment, as it relates to this claim, is denied. [21]

### H. *Plaintiff's RLUIPA Substantial Burden Claim*

In its sole remaining non-ADA/FHA claim, plaintiff alleges that, through its conduct, the Town has placed an undue substantial burden on its religious exercise rights guaranteed under the RLUIPA. Only defendant has moved for summary judgment on this claim.

Section 2000cc(a)(1) of the RLUIPA provides, in pertinent part, as follows:

> *17 No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the ... imposition of the burden ... is in furtherance of

a compelling governmental interest; and ... is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C.2000cc(a)(1). In land-use contexts, the Second Circuit has held that a "substantial burden" occurs when "a government action ... *coerces* the religious institution to change its behavior." *Westchester Day Sch.,* 504 F.3d at 349 (emphasis in original). "[A] burden need not be found insuperable to be held substantial." *Id.*

"[T]o establish a prima facie violation of RLUIPA, a plaintiff must show that the land use regulation at issue as implemented: (1) imposes a substantial burden, (2) on the religious exercise, (3) of a person, institution, or assembly." *Roman Catholic Diocese of Rockville Ctr., N.Y. v. Inc. Vill. of Old Westbury,* No. 09–CV–5195, 2012 WL 1392365, at *7 (E.D.N.Y. Apr.23, 2012) (internal quotation marks omitted). Once a plaintiff has established a *prima facie* case, "the burden shifts to the government to demonstrate that the regulation furthers a compelling governmental interest and is the least restrictive means of furthering that compelling interest." *Roman Catholic Diocese,* 2012 WL 1392365, at *7.

While the RLUIPA generally forbids governmental action that substantially burdens religious exercise and lacks a compelling interest, "a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 531, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993); *accord, Chabad Lubavitch of Litchfield Cnty., Inc. v. Borough of Litchfiled, C. T.,* 853 F.Supp.2d 214, 221–22 (D.Conn.2012). "[E]ven if the [neutral and generally applicable] statute has the effect of incidentally burdening [the plaintiff's] religious exercise, the statute is constitutional so long as it satisfies a rational basis review." *Chabad,* 853 F.Supp.2d at 225. "Under rational basis review, the statute must be reasonable and not arbitrary, and it must bear a rational relationship to a permissible state objective." *Id.* (internal quotation marks and alterations omitted).

In this case, Candlehouse argues that, because the Town's ordinance defining family and its functional equivalent restricts its full use of the Mirador property by precluding it from operating a residence with twelve students, the Town has placed a substantial burden on its religious exercise. Dkt. No. 79 at 25. This argument, however, ignores the Second

Circuit's requirement that "[t]here must exist a close nexus between the coerced or impeded conduct and the institution's religious exercise for such conduct to be a substantial burden on that religion." *Westchester Day Sch.,* 504 F.3d at 349. Accordingly, for its RLUIPA claim to survive defendant's motion for summary judgment, Candlehouse must demonstrate the existence of a genuine dispute of material fact as to whether there is a close nexus between the Town's decision to deny its proposed use of the Mirador property as a residence for more than five unrelated people ("the coerced or impeded conduct") and its religious exercise. A careful review of the record reflects that plaintiff has satisfied this burden.

**\*18**  The record reveals that Candlehouse is a Teen Challenge-affiliated program; Teen Challenge operates as a Christian faith-based program that offers "a balance of Bible classes, work assignments, and recreation." Dkt. No. 68–2 at ¶¶ 3, 4; Dkt. No. 70 at ¶ 3. There is evidence that the Christian faith-based program is separate from the residential program. *See* Dkt. No. 68–2 at ¶ 10 ("Along with the Christian faith-based program, the other important component of Teen Challenge's program is the familylike residential living arrangement each center provides to its students [.]"); Dkt. No. 70 at ¶¶ 26, 27 (explaining that the church located on the Mirador property is used for Teen Challenge classes and the print shop); *see also* Dkt. No. 70 at ¶ 22 ("In September 2008, Candlehouse began considering the purchase of [the Mirador property] for the purposes of combining its residential campus and work training programs with the religious component of the Teen Challenge program[,] which includes Bible study and classes"). Although Mecklenborg states that Candlehouse's inability to operate a residence at the Mirador property precludes students from participating in evening activities, he does not include any support for a finding that these evening activities implement or incorporate religious teachings. Dkt. No. 76 at ¶ 1. In addition, Mecklenborg and Cheryl Clever, a former student and graduate of Candlehouse, explain that having a residence on the Mirador property, which is located in a residential neighborhood, provides students a "unique opportunity to bond," allows them to "develop and maintain relationships," provides a safe environment with access to the outdoors, and "enhances the spiritual element of the program." Dkt. No. 70 at 8–10, 18–19; Dkt. No. 68–1 at ¶ 13. These explanations, however, provide the court with little guidance as to what types of, if any, religious activity occurs at the residence, as distinct from the church property, which plaintiff is permitted to utilize for religious purposes.

At the ZBA hearing, however, counsel for plaintiff stated that "the emphasis through [the] program is ... to increase their faith and their intimacy with God through a disciplined Christ-centered approach to a family living experience[.]" Dkt. No. 60–3 at 7. In addition, counsel explained that the daily routine for Candlehouse students includes periods for worship, chapel, and devotional time interspersed throughout the day. *Id.* at 13–14. The New York General Assemblies of God oversees the Candlehouse program, and Candlehouse is an accredited Teen Challenge program. *Id.* at 15; Dkt. No. 68– 2 at ¶ 8. All of this evidence suggests that the Candlehouse program incorporates religious components in every aspect of a student's experience. As a result, I find that there is a dispute of fact as to whether the Town's denial of its proposed use of the Mirador property has affected Candlehouse's religious exercise.

**\*19** Notwithstanding whether there is a nexus between Town's conduct and Candlehouse's religious exercise, there is nothing in the record to support a finding that the Town's conduct substantially burdened its religious exercise. *See Westchester Day Sch.,* 504 F.3d at 349 (finding that, in land-use contexts, the relevant inquiry is whether "government action ... directly *coerces* the religious institution to change its behavior"). First, under the Town's ordinances, Candlehouse is permitted to operate a residential facility for up to five unrelated persons. Candlehouse has not set forth any reason how precluding it from housing an additional seven students coerces it to change how it operates its program in relation to its religious exercise. *See Guru Nanak Sikh Society of Yuba City v. County of Sutter,* 326 F.Supp.2d 1140, 1152 (E.D.Ca.2003) (finding that for a burden to be substantial, "the governmental regulation must compel action or inaction with respect to the sincerely held belief; mere inconvenience to the religious institution or adherent is insufficient" (citing *Jolly v. Coughlin,* 76 F.3d 468, 477 (2d Cir.1996)). Second, Candlehouse's argument that it is financially burdened by operating two separate facilities is unpersuasive because it ignores that it will have to operate two separate properties even if it is permitted its desired use of the Mirador property because the Mirador property is comprised of two separate properties—400 and 401 Mirador Drive. *See World Outreach Conf. Ctr. v. City of Chicago,* 591 F.3d 531 (7th Cir.2009) (finding no substantial burden on the plaintiff where city denied it permission to demolish a building owned by plaintiff because, *inter alia,* there was no record support for the alleged money lost by the plaintiff, and the organization had suitable alternative site). Accordingly, because plaintiff has

failed to submit evidence giving rise to a dispute of fact as to whether its religious exercise has been substantially burdened, defendant's motion for summary judgment on this claim is granted.

## I. *Plaintiff's Motion to Preclude Defendant's Expert Testimony*

The Town has engaged Cassandra L. Bransford, Ph.D., LCSW–R, to serve as an expert at trial. Dkt. No. 66–2. Dr. Bransford has a Bachelor's degree in English, Master's degree in Social Work, and doctorate in Social Work/ Advanced Practice, and for the past eight years has served as an Associate Professor of Social Work at Binghamton University. *Id.* at 16–17.

In anticipation of testifying at trial, Dr. Bransford authored a report dated July 31, 2012, in which she rendered and offered a basis for the following seven opinions: (1) "Candlehouse does not meet the sociological criteria for a functional family"; (2) "Candlehouse is a Therapeutic Community, not an adult group home/halfway house"; (3) "Candlehouse doesn't need to be located in a residential zone"; (4) "There is no solid research evidence to corroborate Candlehouse's claims to effectiveness"; (5) "Candlehouse does not follow evidence-based protocols for treating individuals with co-occurring disorders"; (6) "There is no evidence to support that Candlehouse residents are disabled or impaired"; and (7) "There is documentation as to the transience of Candlehouse residents." Dkt. No. 66 at 12–13. Plaintiff now seeks an order striking Dr. Bransford's report and precluding her from testifying at trial. *See generally* Dkt. No. 66. Defendant has opposed plaintiff's motion. *See generally* Dkt. No. 83.

### 1. *Governing Legal Principles*
**\*20** The admission of expert testimony in an action pending in a federal court is governed by Rule 702 of the Federal Rules of Evidence, which provides that

[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed.R.Evid. 702. When applying this standard to expert testimony proffered by a party, a trial court is required to perform a gatekeeping function to ensure "that the expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Down Pharms, Inc.,* 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

As a threshold matter, the trial court must examine the question of whether the challenged opinion evidence can satisfy the requirement of Federal Rule of Evidence 401 that evidence offered at trial be relevant to a controverted claim or defense in the case. *Amorgianos v. National R.R. Passenger Corp.,* 303 F.3d 256, 265 (2d Cir.2002). If the requisite degree of relevance is found, the court must then proceed to determine whether the expert opinion sought to be admitted has a sufficiently reliable foundation to allow its consideration by the factfinder. *Amorgianos,* 303 F.3d at 265. This latter inquiry is informed by various relevant factors, including whether (1) the theory or technique can be (and has been) tested; (2) it has been subjected to peer review and publication; (3) there is a known or potential rate of error; and (4) the theory or technique has gained a "degree of acceptance within" the pertinent scientific or technical community. *Daubert,* 509 U.S. at 592–94. " ' General acceptance[,]' [however,] is not a necessary precondition to the admissibility of scientific evidence under the Federal Rules of Evidence, but ... the trial judge [has] the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Id.* at 587. Importantly, while both Rule 702 and the Supreme Court's decisions in *Daubert,* and later in *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), identify specific factors bearing on the question of reliability, courts have stressed that "the *Daubert* inquiry is fluid and will necessarily vary from case to case. *Amorgianos,* 303 F.3d. at 266; *see also Daubert,* 509 U.S. at 594.

Rule 702 does not require rejection of opinions based solely upon the court's disagreement with the conclusions reached or the correctness of the opinions offered. *Daubert,* 509 U.S. at 595. Moreover, although in the first instance the burden of establishing the admissibility of expert testimony

in question rests with the proponent, any doubts as to whether the expert's testimony will be useful should be resolved in favor of admissibility. *Lappe v. Am. Honda Motor Co., Inc.,* 857 F.Supp. 222, 226 (N.D.N.Y.1994) (Hurd, M.J.).

### 2. *Application of Legal Principles*

**\*21** When analyzed against the backdrop of the foregoing principles, only three of Dr. Bransford's seven opinions listed in her report satisfy the criteria for admission at trial. I address each of the opinions below.

#### a. *Functional Family*

One of the opinions offered by Dr. Bransford concerns whether Candlehouse meets the sociological criteria for a functional family. Dkt. No. 66–2 at 12. Dr. Bransford begins her recitation concerning this topic by stating "it may be useful first to identify what sociologists and the socioglical literature have to say about what constitutes a functioning family." *Id.* at 2. Conspicuously absent from Dr. Bransford's analysis, however, is any reference to the criteria set out in the Town's zoning ordinance defining family and its functional equivalent. Dr. Bransford does not disclose the basis for correlating the sociological criteria for defining "family" or its functional equivalent and the definitions provided in the Town's ordinance. [22] Similarly, the relevant zoning provision is completely devoid of any reference to the sociological criteria listed by Dr. Bransford in her report. Dkt. No. 60–1 at 8 (Town of Vestal Zoning Article I, Section 24–1). For these reasons, I find that Dr. Bransford's opinions on this subject demonstrate a lack of the reliability required for admission under Rule 702.

In addition, notwithstanding Rule 702, Dr. Bransford's opinions regarding whether Candlehouse's students operate as a family or the functional equivalent thereof are lacking in probative value because they do not relate to the Town's zoning code. For example, whether Candlehouse's students operate as a family when considered in light of the sociological criteria cited by Dr. Bransford does not make it more or less likely that the Town discriminated against plaintiff under the ADA or FHA in deciding whether Candlehouse satisfies the criteria set forth in the relevant zoning provision. For this reason, the expert's opinions regarding this matter are inadmissible pursuant to Rule 401 and 402 of the Federal Rules of Evidence. *See* Fed.R.Evid. 401(a) ( "Evidence is relevant if ... it has any tendency to make a fact more or less probable than it would be without the evidence[.]"); Fed.R.Evid. 402 ("Relevant

evidence is admissible[.]"). In any event, however, whatever minimal relevance Dr. Bransford's opinions regarding the definitions of family and the functional equivalent of a family using sociological criteria may carry, that probative value is substantially outweighed by the risk of confusion to the jury when considering her opinions, and attempting to reconcile them with the facts of this case, which relate only to a municipality's zoning code and the intent of that municipality's officials in interpreting that zoning code. *See* Fed.R.Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of ... confusing the issues [.]"). For all of these reasons, this portion of Dr. Bransford's report is stricken, and she is precluded from testifying on this matter at trial.

**b.** *Disability*

**\*22** In her report, Dr. Bransford also offers her opinion concerning whether Candlehouse residents are "disabled or impaired." Dkt. No. 66–2 at 11, 12–13. This portion of the expert's report is equally problematic. Dr. Bransford did not address the question of disability in the context of the ADA and FHA, neither of which is even referenced in the report. Moreover, the title of this section of her report, "Are Candlehouse Residents Disabled or Impaired?," signals a critical misconception of how the trier of fact is required to determine disability. Dkt. No. 66–2 at 11. Under the ADA and FHA, "disabled" and "impaired" are not co-extensive. Instead, one of the ways to find that a person is disabled under the ADA and FHA is for the factfinder to first determine whether a person at issue suffers from an impairment. 42 U.S.C. §§ 3602(h), 12102(1). If an impairment is discerned, then the factfinder must determine whether that impairment substantially limits a major life activity. *Id.* Dr. Bransford's report, in contrast, does not undergo this analysis, and instead suggests that the terms are interchangeable, which is not correct under the ADA and FHA.

Additionally, I note that the question of whether Candlehouse serves a disabled population can only be determined by the factfinder after applying the law set forth under the ADA and FHA. While it is true that Rule 704 of the Federal Rules of Evidence does not automatically preclude testimony from an expert on an ultimate issue such as this, the Second Circuit has unequivocally held that, despite Rule 704, trial experts may not opine on such an ultimate issue. *Hygh v. Jacobs,* 961 F.2d 359, 363 (2d Cir.1992). Specifically, the Second Circuit has held that,

[w]hile Rule 704 has abolished the common law 'ultimate issue' rule, however, it has not 'lowered the bars so as to admit all opinions.' This circuit is in accord with other circuits in requiring exclusion of expert testimony that expresses a legal conclusion.... Even if a jury were not misled into adopting outright a legal conclusion proffered by an expert witness, the testimony would remain objectionable by communicating a legal standard—explicit or implicit—to the jury. Whereas an expert may be uniquely qualified by experience to assist the trier of fact, he is not qualified to compete with the judge in the function of instructing the jury.

*Hygh,* 961 F.2d at 363 (internal citations and alterations omitted)). For this reason, Dr. Bransford is precluded from testifying as to whether Candlehouse serves a disabled or handicapped population, and that portion of her report is stricken. [23]

**c.** *Candlehouse's Effectiveness; Following Evidence–Based Protocols*

Dr. Bransford's report also evaluates whether the Candlehouse program effectively addresses its students' various disorders. Dkt. No. 66–2 at 7–8. Specifically, Dr. Bransford observes that the agency's claims of success "have been widely refuted in the scientific literature." [24] *Id.* at 8. She also concludes that "Candlehouse does not follow an evidence-based protocol for treating individuals with co-occurring disorders." *Id.* at 12. Neither of these inquiries, however, bear relevance on any of the claims or defenses in this action. Whether Candlehouse's program is successful does not make it more or less likely that the Town discriminated against Candlehouse under the ADA, FHA, or RLUIPA. Fed.R.Evid. 402. Similarly, whether Candlehouse uses a certain methodologies (scientific or otherwise) to implement its program is irrelevant to the question of discrimination based on disability or religion. *Id.* In addition, whatever relevance these opinions do have is substantially outweighed by the risks of unfair prejudice and confusion of the issues to a jury because plaintiff's claims do not relate at all to whether Candlehouse's program meets the criteria set forth by Dr. Bransforth. Accordingly, the portion of Dr. Bransford's report opining on these two issues is stricken, and she is precluded from testifying about them at trial.

**d.** *Dr. Bransford's Other Opinions*

**\*23** The remaining opinions set forth in Dr. Bransford's report, while of marginal relevance, appear to be supported and within her range of expertise. Accordingly, while the portions of her report identified above are stricken, and she is precluded from testifying about them at trial, I will permit her to testify concerning the remaining opinions, including whether (1) Candlehouse is a therapeutic community or instead an adult home/halfway house; (2) Candlehouse needs to be located in a residential zone; and (3) there is documentation concerning the transience of Candlehouse residents.

**J. Sanctions/Spoliation**

The final pending motion to be addressed is plaintiff's request for sanctions based upon the Town's alleged destruction of, or failure to produce, relevant information that was requested during discovery. Dkt. No. 64. Plaintiff argues that (1) the Town failed to take the requisite actions to preserve evidence and notify Town Board members and other Town officials of the duty of preservation; (2) the Town failed to collect and produce relevant documents and records from all Town officials in response to plaintiff's discovery demands, as revealed during the depositions of various Town officials; and (3) regularly deleted e-mails and other documents involving claims and defenses in this case, both prior to and during the course of this litigation. *See generally* Dkt. No. 64– 10. As relief, plaintiff asks the court to issue an adverse inference instruction, as well as to preclude Town officials from testifying that (1) they were not motivated by any discriminatory bias, (2) they themselves did not maintain any discriminatory bias against plaintiff, and (3) they were not persuaded or influenced by the neighborhood opposition. *Id.* at 14–15. Plaintiff also moves for attorney's fees incurred in bringing its motion. Dkt. No. 89 at 12. Defendant opposes the motion and requests sanctions against plaintiff for filing a "frivolous" motion. *See generally* Dkt. No. 80.

Although plaintiff's allegations are troubling, it was obligated to confer in good faith with opposing counsel, and to thereafter seek an order compelling discovery if counsel could not agree on a course of action. Fed.R.Civ.P. 37(a)(1) ("[A] party may move for an order compelling disclosure or discovery. The motion must include a certification that the movant has in good faith conferred or attempted to confer with the person or party failing to make disclosure[.]"). Had plaintiff followed that course of action, and the Town continued to neglect its discovery obligations, the court would then have been positioned to issue the sanctions requested by plaintiff and listed in Rule 37(b) as a result of the Town's

failure to obey the order .[25] *See Pro Bono Invs., Inc. v. Gerry,* No. 03–CV–4347, 2005 WL 2429767, at *1 (S.D.N.Y. Sept. 30, 2005)* ("By its terms, Rule 37 requires a meet-and-confer conference and authorizes sanctions only after a motion is granted for discovery is made after a motion is filed."). Because plaintiff instead has attempted to bypass these meaningful preliminary requirements by requesting the equivalent of sanctions available under Rule 37(b), I do not find it appropriate to award such relief. In order to avoid unfair prejudice to plaintiff, however, and because the court retains the discretion to impose sanctions on a party for misconduct in discovery absent a discovery order, *Residential Funding Corp. v. DeGeorge Fin. Corp.,* 306 F.3d 99, 106–07 (2d Cir.2002), the court will permit plaintiff to submit a limited document discovery request to defendant seeking additional evidence that it reasonably believes is still available and relevant to the claims and defenses in this action, as revealed by the deposition testimony of Town officials.

**\*24** The question of the destruction or non-preservation of evidence, which amounts to an allegation of spoliation, is equally, if not more, troublesome. Spoliation is defined as "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *West v. Goodyear Tire & Rubber Co.,* 167 F.3d 776, 779 (2d Cir.1999)* (citing *Black's Law Dictionary* 1401 (6th ed.1990)). For obvious reasons, one who engages in spoliation should not be permitted to benefit from such wrongdoing. *West,* 167 F.3d at 779.

Courts are invested with broad discretion in determining an appropriate sanction to be imposed in the event it finds spoliation. *West,* 167 F.3d at 779. The sanctions available to a court can range in severity from dismissal to an adverse inference jury instruction. *Wade v. Tiffin Motorhomes, Inc.,* 686 F.Supp.2d 174, 196 (N.D.N.Y.2009)* (Suddaby, J.) (citing *Allstate Ins. Co. ex rel. Lothridge v. Gonyo,* No. 07–CV–1011, 2009 WL 962698, at * 8 (N .D.N.Y. Apr. 8, 2009)* (Treece, M.J.)). The Second Circuit has noted that any sanction imposed "should be molded to serve the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine." *West,* 167 F.3d at 779. When applying this principle, a court should impose a sanction designed to

(1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore 'the prejudiced party to the

same position he would have been in absent the wrongful destruction of evidence by the opposing party.'

*Id.* (quoting *Kronisch v. United States,* 150 F.3d 112, 126 (2d Cir.1998)).

A common sanction imposed by the court to punish a party's spoliation is a spoliation jury charge, in which the jury is instructed that it may draw an adverse inference based upon the destruction. *Chin v. Port Auth. of New York and New Jersey,* 685 F.3d 135, 162 (2d Cir.2012). To warrant the issuance of such an instruction, the moving party must demonstrate that (1) the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) the evidence was destroyed with a culpable state of mind; and (3) the destroyed evidence was relevant to an adverse party's claim or defense such that a reasonable trier of fact could find that it would support the claim or defense. *Chin,* 685 F.3d at 162; *Wade,* 686 F.Supp.2d at 193. The decision of whether to issue an adverse inference instruction based upon lost evidence rests within the discretion of the trial court. *Chin,* 685 F.3d at 162.

In many instances, a spoliation claim arises out of an alleged failure of a party to implement a "litigation hold" based upon an existing or pending suit. A party's failure to implement a "litigation hold," in the face of impending litigation, does not constitute *per se* gross negligence warranting an adverse inference instruction. *Chin,* 685 F.3d at 162. Rather, that failure is but one of several relevant factors to consider in determining whether such a sanction is warranted. *Id.* Moreover, while a finding of gross negligence in failing to preserve evidence may provide a basis for an adverse inference, such a finding does not require the trial court to provide such an instruction. *Id.; Residential Funding Corp.,* 306 F.3d at 109.

**\*25** Here, as a threshold matter, plaintiff's motion requires the court to determine whether the Town's "duty to preserve" attached in January 2011, when this action was filed, or on May 5, 2010, when plaintiff sent its letter to defendant notifying the Town of Candlehouse's position that the Town's determination violated federal laws. *Compare* Dkt. No. 80 at 9 *with* Dkt. No. 89 at 6. "The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." *Fujitsu Ltd. v. Fed. Express Corp.,* 247 F.3d 423 (2d Cir.2001). Because defendant in this case has been involved in a dispute with plaintiff since at least September 2008, it is not unreasonable

to find that the Town "should have known that the evidence [sought by plaintiff] may be relevant to future litigation" by May 5, 2010, thereby triggering a duty to preserve relevant evidence. *West,* 167 F.3d at 779.

Next, I must decide whether evidence at issue was intentionally destroyed. *See Fujitsu Ltd.,* 247 F.3d at 436; *Residential Funding Corp.,* 306 F.3d at 108 ("[T]he culpable state of mind factor is satisfied by a showing that the evidence was destroyed knowingly, even if without intent to breach a duty to preserve it, or negligently." (internal quotation marks, alterations, and emphasis omitted)). If defendant did not notify the relevant Town officials of their duty to preserve evidence, at a minimum, this is sufficient to establish negligence. Notably, defendant does not argue that its attorneys notified the relevant Town officials, whose e-mails were allegedly deleted, to search for information requested by plaintiff. *See generally* Dkt. Nos. 80, 81.

The third consideration is whether the evidence alleged to have been destroyed is relevant to any of plaintiff's claims. *Residential Funding Corp.,* 306 F.3d at 107. In this instance, the evidence alleged to have been destroyed consists of e-mails to and from Town officials, and specifically Town Board members, regarding the Candlehouse matter. Those e-mails are alleged to include those between Town Board members and residents, as well as among Town Board members themselves. Those communications are potentially relevant to plaintiff's intentional discrimination claim because the surrounding circumstances and history leading up to the ZBA's decision that plaintiff's program does not constitute the functional equivalent of a family are relevant considerations when determining whether the ZBA was motivated by discriminatory intent. [26] In any event, the e-mails could also be relevant to plaintiff's reasonable accommodation claim because it was the Town Board that made the decision to deny the request for a reasonable accommodation. If the e-mails now sought by plaintiff demonstrate discriminatory bias, then they could tend to show that the Town Board denied the reasonable accommodation on the basis of discrimination.

**\*26** Despite all of these findings, I am not inclined, at this juncture, to impose the sanctions sought by plaintiff, primarily because I do not find that the record has been sufficiently developed to determine what led to the destruction, if any, of relevant emails by Town officials. Accordingly, plaintiff's motion for sanctions is denied, without prejudice to renewal at trial. Based upon the testimony adduced at trial, the court reserves the right to

include an adverse inference charge in its jury instructions based upon the allegation of spoliation.

## IV. *SUMMARY AND RECOMMENDATION*

Based upon the record now before the court, I conclude that there remains a genuine dispute of material fact as to whether Candlehouse serves a disabled or handicapped population under the ADA and FHA, a threshold determination that must be made in order to resolve any claim of discrimination under those provisions. Similarly, issues of fact preclude a finding as a matter of law that defendant intentionally discriminated against the plaintiff and its students, and in denying plaintiff's request for a reasonable accommodation. I do, however, find that no reasonable factfinder could conclude, based upon the existing record, that the requirements to establish a disparate impact claim under the FHA and the ADA have been satisfied. For this reason, defendant's motion for summary judgment on that claim is granted. Similarly, I conclude that plaintiff has failed to demonstrate that a reasonable factfinder could find the requisite burden upon plaintiff and its students in their religious exercise, sufficient to support a claim under the RLUIPA.

Turning to plaintiff's non-dispositive motions, I find that substantial portions of the report of defendant's expert fails to meet the criteria of Federal Rule of Evidence 702 and *Daubert,* and in any event are excludable under Rules 401, 402 and 403. For those reasons, I will strike those portions of the expert report and preclude the expert from testifying on those subjects at trial. Additionally, I conclude that, having failed to avail itself of the remedies afforded under Rule 37(a) of the Federal Rules of Civil Procedure and to confer with defendant's counsel before bringing the instant motion, Candlehouse is not positioned to seek sanctions under Rule 37(b). As to plaintiff's allegation of spoliation, I find that the record is not sufficiently developed as to the factors necessary to inform the court's decision, and will therefore deny plaintiff's motion without prejudice to renewal at trial, and, if appropriate, will administer a spoliation instruction to the jury at the close of the case.

Based upon the foregoing it is hereby

ORDERED as follows:

(1) Defendant's motion for summary judgment (Dkt. No. 59) is GRANTED, in part.

(2) Plaintiff's claim of discrimination based upon a disparate impact theory under the FHA and ADA is hereby DISMISSED.

(3) Plaintiff's claim of a substantial burden on the free religious exercise rights in violation of the RLUIPA, is DISMISSED.

 **\*27** (4) Plaintiff's second motion for summary judgment (Dkt. No. 68) is DENIED.

(5) Pursuant to Rule 41(a)(2) of the Federal Rules of Civil Procedure and the stipulation of the parties, Counts IV (denial of equal terms under the RLUIPA), Count V (free exercise of religion under the First and Fourteenth Amendments) and Count VI (denial of equal protection under the Fourteenth Amendment) are hereby dismissed, with prejudice.

(6) Plaintiff's motion for sanctions (Dkt. No. 64) is DENIED without prejudice to its right to renew that application during the trial in this matter.

(7) Plaintiff's motion to strike defendant's expert report and to preclude her from testifying at trial (Dkt. No. 66) is GRANTED, in part. Defendant's expert shall be precluded from giving testimony at trial concerning the following topics, as reflected in her expert report:

   a. "Candlehouse does not meet the sociological criteria for a functional family."

   b. "There is no solid research evidence to corroborate Candlehouse's claims to effectiveness."

   c. "Candlehouse does not follow evidence-based protocols for treating individuals with co-occurring disorders."

   d. "There is no evidence to support that Candlehouse residents are disabled or impaired."

(8) No costs or attorneys' fees are awarded to any party in connection with the pending motions.

(9) A final pretrial conference will be held in this matter, by telephone, on May 14, 2013, at 3:00pm. During that conference, the parties should be prepared to discuss the appropriate timing and location of the trial in this matter. Plaintiff's counsel is directed to make appropriate arrangements for placing the call.

Footnotes

1   This action is before me based upon consent of the parties, pursuant to 28 U.S.C. § 636(c). Dkt. No. 20.

2   Section 24–1 of the Town's zoning code defines "family" as follows:

Family means:

(1) Any number of persons occupying a single dwelling single dwelling unit, related by blood, marriage or legal adoption, living and cooking together as a single housekeeping unit.

(2) Any number of persons occupying a single dwelling unit, not exceeding five (5) adults living and cooking together as a single housekeeping unit where all were not related by blood, marriage or legal adoption.

(3) Notwithstanding the provisions of subsection (2) of this definition, a group of unrelated persons numbering more than five (5) shall be considered a "family["]: upon a determination by the zoning board of appeals that the group is the functional equivalent of a family pursuant to the standards enumerated in subsection (1) herein. Thia presumption may be rebutted and the non-related individuals may be considered the functional equivalent of a "family" for the purposes of this article by the zoning board of appeals if such group of individuals exhibits one (1) or more characteristics consistent with the purposes of zoning restrictions in residential districts.

(4) In determining whether a group of more than five (5) unrelated persons constitutes a "family" for the purpose of occupying a dwelling unit, as provided for in subsection (3) of this definition, the zoning board of appeals shall utilize the standards enumerated in subsection (1) in making said determination. Before making a determination under this subsection, the zoning board of appeals shall hold a public hearing, after public notice. Said application shall be on a form provided by the zoning board of appeals accompanied by the required fee.

(5) In making a determination under subsection (4), the zoning board of appeals shall find that:

a. The group is one which in theory, size, appearance and structure resembles a traditional "family" unit.

b. The group is one which will live and cook together as a single housekeeping unit.

c. The group is of a permanent nature and is neither a framework for transient or seasonal living nor merely an association or relationship which is transient.

d. In no case shall a dwelling be occupied by more than two (2) adults to a conventional bedroom.

e. All other requirements of this local law regarding the use and occupancy of dwelling units shall be complied with.

f. Any determination under this subsection shall be limited to the status of a particular group as a family and shall not he interpreted as authorizing any other use, occupancy or activity.

g. In making any such determination, the board of appeals may impose such conditions and safeguards as the board of appeals shall deem necessary or advisable in order to maintain the stability and character of the neighborhood and protect the public health, safety and welfare, including but not limited to ingress, egress. lighting, off-street parking and screening.

(6) Persons occupying group quarters such as a dormitory, fraternity or sorority house or a seminary shall not•be considered a "family".

(7) Occupancy by two (2) or more illegal aliens shall be prescriptive evidence of a violation at this section.

Dkt. No. 60–1 at 7–8.

3   The ZBA is comprised of appointed members who receive no compensation for their service; its function is to decide appeals from, and review decisions of, the Town's administrative officials related to zoning. Dkt. No. 60 at ¶ 8.

4   Although plaintiff argues that, when considered together, two letters from defendant's attorney (dated December 14, 2010, Dkt. No. 69–13, and May 10, 2012, Dkt. No. 69–20) are tantamount to a denial, defendant argues that neither letter was a denial of plaintiff's request for a reasonable accommodation.

5   In response to defendant's motion for summary judgment, plaintiff "agree[d] to a voluntary nonsuit of its claims against Defendant under the First and Fourteenth Amendment (Counts V and VI), and the Equal Terms Provision of the [RLUIPA] (Count IV)." Dkt. No. 79 at 3. At oral argument, held on February 15, 2013, the court dismissed those claims based upon plaintiff's agreement.

6   Defendant has not challenged plaintiff's standing in this action.

7   More specifically, the term "handicap" under the FHA is defined as the following:

[W]ith respect to a person—

(1) a physical or mental impairment with substantially limits one or more of such person's major life activities,

(1) a record of having such an impairment, or

(3) being regarded as having such an impairment, but such term does not include current, illegal use of or addiction to a controlled substance[.]

42 U.S.C. § 3602(h). The ADA defines the term "disability" as follows:

[W]ith respect to an individual-

(A) a physical impairment that substantially limits one or more major life activities of such individual;

(B) a record of such impairment; or

(C) being regarded as having such an impairment[.]

42 U.S.C. § 12102(1).

8   Although the three-part test enunciated in *Bragdon* pertained to claims under the ADA, in its analysis, the Supreme Court determined that the ADA is to "be construed in accordance with pre-existing regulatory interpretations," including the FHA. *Bragdon,* 524 U.S. at 631. For this reason, I have extended the test to claims of discrimination arising under the FHA.

9   According to plaintiff's submissions, at the time of admission into the Candlehouse program, a student must be drug and alcohol free. Dkt. No. 70 at ¶ 12.

10   In its motion for summary judgment, plaintiff argues that *RECAP* holds, unequivocally, that alcoholics are disabled. Dkt. No. 68–4 at 8. This argument, however, misconstrues the court's holding in *RECAP. RECAP* actually held that, because one of the plaintiff's "baseline prerequisite[s] for admittance" to its facility is the "inability to live independently without suffering a relapse," then by definition plaintiff's residents were disabled. *RECAP,* 294 F.3d at 47–48. Here, Candlehouse's admission requirements do not mandate that a potential student suffer from any *per se* impairment under an FHA/ADA disability analysis, or, importantly, that a potential student demonstrate that her impairment limits a major life activity as required under the FHA and ADA. While the record appears to suggest that plaintiff requires a prospective student to suffer from "life controlling issues," a term that seems to only *imply* a limitation to a major life activity, the only record evidence that supports this implication is Mecklenborg's affidavit, in which he states, in conclusory fashion, "I have personally witnessed each and every resident of Candlehouse struggle in a significant manner with at least one major life activity at the time of enrolling in Candlehouse[.]" Dkt. No. 70 at ¶ 14.

11   Defendants do not appear to dispute that at least some of plaintiff's students may qualify as disabled under the FHA and ADA.

12   *Innovative Health Sys., Inc.*'s procedural posture also distinguishes it from this case. That matter was decided on appeal from the issuance of a preliminary injunction, and the court discussed the nature of the plaintiff's residents' impairments when inquiring into the likelihood-of-the-success prong of the preliminary injunction analysis. *Innovative Health Sys., Inc.,* 117 F.3d at 48. In addition, the Second Circuit appears to have assumed that a drug addict is disabled by virtue of his diagnosis without, for example, inquiring into whether his addiction actually limits a major life activity. *Id.*

13   Interestingly, the Second Circuit expressed its doubt that *any* of the plaintiff's participants actually used drugs because, *inter alia,* the program did not permit drug use.

14   Only one full student file is on record with the court. Dkt. No. 85 (sealed).

15   Of course, this finding does not preclude the entry of summary judgment in favor of defendant because it is possible that, even assuming plaintiff can meet the threshold requirement of demonstrating it serves a disabled population, there is insufficient record evidence to give rise to a dispute of material fact as to the other elements of its various discrimination claims.

16   Indeed, the record evidence establishes that many Town residents demonstrably opposed Candlehouse's proposed use of the Mirador property. *See, e.g.,* Dkt. No. 70 Exh. E(DVD) (traditionally filed, not electronically filed); Dkt. No. 70–3. A videotape recording of the neighborhood meeting held on December 22, 2008, to discuss the proposal reveals that many community members openly expressed displeasure against the prospect of Candlehouse moving into the neighborhood. Dkt. No. 70 Exh. E(DVD) (traditionally filed, not electronically filed). For example, one or more of the community residents compared plaintiff's students that are recovering alcoholics and drug addicts to sex offenders and felons. *Id.* At least two Town Board members in attendance spoke out against Candlehouse moving into the area. *Id.* One of those Town Board members even appeared to threaten to have the district rezoned so that Candlehouse could not move in. *Id.* In total, four Town Board members attended this community meeting. Dkt. No. 69–3 at 5.

17   As is discussed more below, the intent and motivation of the Town Board is, however, relevant to plaintiff's request for a reasonable accommodation.

18   Although the court acknowledges that, even assuming Dedrick and the ZBA were aware of the community's disapproval of Candlehouse, such awareness does not necessarily mean that Dedrick and the ZBA's decisions were motivated by discrimination. However, plaintiff has at least submitted sufficient evidence to give rise to a dispute of fact as it relates to this issue.

19   This is true notwithstanding whether plaintiff is able to prove that the majority of its students are disabled under the ADA and FHA. More specifically, even assuming plaintiff could prove that its student population is comprised of a sufficient number of disabled persons thereby establishing that Candlehouse is protected by the ADA and FHA, it has failed to come forward with specific facts showing a genuine dispute of material fact for trial as to whether defendant's zoning ordinance actually or predictably discriminates against its students.

20   Significantly, defendant's counsel, in a later letter to plaintiff's attorney, indicated that, when he stated that the Town was not agreeable to plaintiff's request, he was, in fact, referring to plaintiff's request for a reasonable accommodation. Dkt. No. 69–20 at 1.

21   The entry of summary judgment concerning this cause of action is also precluded by the existence of an existing dispute of fact as to whether the accommodation sought by Candlehouse is necessary to serve its students' impairments. As was already discussed, those

impairments vary, and there is no record evidence, aside from Mecklenborg's affidavit and deposition testimony, that the students' impairments require a residential neighborhood for rehabilitation. The nature of the Candlehouse program, however, is such that the students are strictly managed in virtually all of their daily activities, and do not go out into the community until they have completed at least three to five months of the program. When they are allowed out into the community, the students are supervised. Given these program characteristics, it is not at all clear what a residential neighborhood offers the students that a non-residential neighborhood could not, or that the program could not exist or be successful in a non-residential neighborhood.

22   Indeed, based upon the recitation of the materials she was provided in preparation for her report, it appears that Dr. Bransford never actually reviewed any of the Town's zoning code, including the relevant provisions at issue in this case. *See* Dkt. No. 66–2 at 2 (listing fourteen items that "were provided to [her] by defendant's attorney's office").

23   I further find that, to the extent that Dr. Bransford has analyzed whether a random sampling of Candlehouse's students are disabled by using sociological criteria, her conclusion on the matter is substantially outweighed by the risk of confusion by the jury in distinguishing between the criteria relied on by Dr. Bransford, and the criteria it is required to consider under the ADA and FHA. Fed.R.Evid. 403.

24   The portion of Dr. Bransford's report addressing this issue is provocatively entitled "Candlehouse's Effectiveness: Myth or Fact." Dkt. No. 66–2 at 7.

25   Among the sanctions available under that section are the following:

(i) directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;

(ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;

(iii) striking pleadings in whole or in part;

(iv) staying further proceedings until the order is obeyed;

(v) dismissing the action or proceeding in whole or in part;

(vi) rendering a default judgment against the disobedient party; or

(vii) treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination. Fed.R.Civ.P. 37(b)(2)(A).

26   In addition, although it is not alleged, it is possible that some of the discarded e-mails were between Town Board members and ZBA members, and that those lost e-mails may have disclosed the Town Board members' feelings regarding the Candlehouse matter.

---

**End of Document**                                      © 2013 Thomson Reuters. No claim to original U.S. Government Works.

Automobile Ins. Co. of Hartford v. Electrolux Home..., Not Reported in...

Case 6:11-cv-01174-DEP Document 196 Filed 06/04/13 Page 45 of 58

2011 WL 1434672
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

The AUTOMOBILE INS. CO. OF
HARTFORD, a/s/o Sherry Demrick, Plaintiff,
v.
ELECTROLUX HOME
PRODUCTS, INC., Defendant.

No. 08–CV–00623(A)(M). | March 24, 2011.

**Attorneys and Law Firms**

Brian P. Henry, Craig Archer Raabe, Jeffrey John White, Robinson & Cole, LLP, Hartford, CT, Michael J. Kanaley, Jr., Buffalo, NY, for Plaintiff.

Cheryl M. Nicolson, Melissa L. Yemma, Nicolson Associates, LLC, Media, PA, Michael J. Guarrara, Guararra & Zaitz, New York, NY, Louis B. Dingeldey, Jr., Baxter, Smith & Shapiro, P.C., West Seneca, NY, for Defendants.

**Opinion**

**REPORT AND RECOMMENDATION**

JEREMIAH J. McCARTHY, United States Magistrate Judge.

**\*1** This action was referred to me by Hon. Richard J. Arcara for supervision of pretrial proceedings in accordance with 28 U.S.C. §§ 636(b)(1)(A), (B) and (C) [6].[1] Before me is the motion of plaintiff The Automobile Insurance Co. of Hartford for summary judgment dismissing certain affirmative defenses asserted by defendant Electrolux Home Products, Inc., ("Electrolux") [65]. Oral argument was held before me on March 22, 2011. For the following reasons, I recommend that the motion be granted in part and denied in part.

**BACKGROUND**

This is a products liability action in which plaintiff, as subrogee, seeks recovery of damages paid to its insured-subrogor, Sherry Demrick,[2] as a result of a fire at her home on December 24, 2006, which it alleges was caused by a defective Electrolux gas clothes dryer. Amended Complaint [17]. Electrolux has asserted nineteen affirmative defenses, and plaintiff seeks dismissal of all of those defenses except the seventeenth ("misuse of product"). *See* plaintiff's brief [66], p. 1, n. 1 ("the sole Affirmative Defense not challenged through this Motion is the Defendant's seventeenth, which alleges misuse of product").

Electrolux does not oppose the motion to dismiss its third, fourth, fifth, sixth, seventh, eighth, ninth, tenth, eleventh, twelfth, thirteenth, fourteenth, fifteenth, sixteenth, eighteenth and nineteenth affirmative defenses. *See* Electrolux's Response [77], ¶ 3. Therefore, the only defenses remaining at issue on this motion are the first (contributory negligence) and the second (assumption of the risk).

**ANALYSIS**

**A. First Affirmative Defense: Contributory Negligence**

Plaintiff argues that expert testimony is necessary in order to establish a standard of care which Ms. Demrick allegedly breached. I disagree. "An expert witness is required to support a claim of departure from safe practice only where the issue involved transcends the realm of knowledge that lay persons possess, such as standards of medical care." *Rosen v. Salem Truck Leasing, Inc.,* 108 A.D.2d 907, 485 N.Y.S.2d 793, 794 (2d Dept.1985). However, "expert testimony is not necessary where the negligence is obvious and within ken of laymen". *Gibson v. D'Amico,* 97 A.D.2d 905, 906, 470 N.Y.S.2d 739, 741 (3d Dept.1983), *app. denied,* 61 N.Y.2d 603, 472 N.Y.S.2d 1027, 460 N.E.2d 1360 (1984).

The proper use and operation of a clothes drier is sufficiently within the "ken of laymen" that expert testimony as to the standard of care is not necessary. For example, even without the benefit of expert testimony as to the standard of care, from the photo of the clogged exhaust cap (Electrolux brief [78], p. 2), a jury could properly conclude that Ms. Demrick had not adequately cleared the drier of debris. *See also* Electrolux's "Use and Care Guide", which warns: "Keep area around the exhaust opening and surrounding areas free from the accumulation of lint, dust and dirt". *Id.* Although plaintiff argues that the manufacturer's instruction manuals are not "conclusive evidence of the proper standard of care" (plaintiff's Reply [99], p. 5, citing *Monk v. Doctors Hospital,* 403 F.2d 580, 582 (D.C.Cir.1968)), they are *some* evidence of that standard. "Although it is correct that the manuals do not purport to articulate the standards prevailing

Automobile Ins. Co. of Hartford v. Electrolux Home..., Not Reported in...

Case 6:11-cv-01174-DEP   Document 196   Filed 06/04/13   Page 46 of 58

in this area, they are plainly directed at correct use of the machine and [persons] using such a machine cannot ignore instructions of the maker without some reason. Hence the manuals had probative value and were properly admitted. Moreover, since both Dr. Darner and the nurse testified that they were familiar with these manuals, the manuals would demonstrate that [they] were on notice as to the risks of improper operation of the ... machine." *Monk,* 403 F.2d at 582.

 **\*2**  Plaintiff suggests that "it is the Court's obligation to define precisely the duty owed by Demrick in view of the existing evidence". Plaintiff's brief [66], p. 9. I do not believe that a "precise" definition is necessary. *See N.Y. Pattern Jury Instructions ("PJI") 2:10* ("Negligence is a lack of ordinary care. It is a failure to use that degree of care that a reasonably prudent person would have used under the same circumstances"); 5 Sand, *et. al., Modern Federal Jury Instuctions (Civil) 2010,* Instruction 89–9 (containing similar language).

Plaintiff argues that since it has not moved for dismissal of Electrolux's seventeenth affirmative defense ("misuse of product"), Electrolux should resort to that defense rather than the defense of contributory negligence. Plaintiff's brief [66], p. 8, n. 2. However, the fact that plaintiff has not challenged the "misuse of product" defense is a further indication of the potential viability of the contributory negligence defense; and while the two defenses may be similar, they are not necessarily identical. "[A]n affirmative defense should not be dismissed if there is any doubt as to its availability." *Zollinger v. Owens–Brockway Glass Container, Inc.,* 233 F.Supp.2d 349, 359 (N.D.N.Y.2002); *Thy Tran v. Avis Rent A Car, Inc.,* 289 A.D.2d 731, 732, 734 N.Y.S.2d 662 (3d Dept.2001).

It is well settled that "the issue of contributory negligence ... is a jury question in all but the clearest cases." *MacDowall v. Koehring Basic Const. Equipment,* 49 N.Y.2d 824, 827, 427 N.Y.S.2d 617, 404 N.E.2d 738 (1980). Since this is not one of those "clearest cases", the defense should be allowed.

**B. Second Affirmative Defense: Assumption of the Risk**
"There are two doctrines of assumption of the risk.... Express, or primary, assumption of the risk, precludes recovery and is based on a preexisting agreement stating that defendant need not use reasonable care for the benefit of plaintiff and would not be liable for the consequence of conduct that would otherwise be negligent." *Pearce v. Holland Property Management, Inc.* 2009 WL 1605355, *6 (N.D.N.Y.2009).

"Primary assumption of the risk is limited to situations where there is an elevated risk of danger, typically in a professional sporting or entertainment activity." *Id.*

"[A] claim of strict products liability and a defense of primary assumption of risk are in inherent conflict, and one must give way. We conclude that the defense of primary assumption of risk is not available to eliminate or reduce a manufacturer's duty to produce a nondefective product ... even where the product's dangerous qualities are obvious to and appreciated by the user." *Lamey v. Foley,* 188 A.D.2d 157, 167–68, 594 N.Y.S.2d 490, 497–98 (4th Dept.1993).

"The second doctrine of assumption of the risk is frequently referred to as implied assumption of the risk and analyzed with contributory negligence under the general rubric of comparative negligence." *Pearce,* 2009 WL 1605355, *6. "Under New York law, a plaintiff's conduct may be considered by a jury in allocating responsibility for any damages resulting from negligent conduct but imposes no bar to recovery. N.Y.C.P.L.R. § 1411 (McKinney 2002). Thus, any finding of implied assumption of the risk by plaintiffs here will result in the proportional reduction of any damages but not a total bar to recovery." *Id.*

 **\*3**  During oral argument, counsel for Electrolux acknowledged that the second affirmative defense is intended to refer only to implied, rather than express, assumption of risk. As so limited, I conclude that this defense need not be stricken, for the same reasons as those discussed with respect to the defense of contributory negligence.

## CONCLUSION

For these reasons, I recommend that plaintiff's motion [65] be granted to the extent that it seeks dismissal of Electrolux's second affirmative defense (only as to express, but not implied, assumption of the risk), and its third, fourth, fifth, sixth, seventh, eighth, ninth, tenth, eleventh, twelfth, thirteenth, fourteenth, fifteenth, sixteenth, eighteenth and nineteenth affirmative defenses, but that the motion otherwise be denied.

Unless otherwise ordered by Judge Arcara, any objections to this Report and Recommendation must be filed with the clerk of this court by April 11, 2011(applying the time frames set forth in Rules 6(a) (1)(C), 6(d), and 72(b)(2)). Any requests for extension of this deadline must be made to Judge

Automobile Ins. Co. of Hartford v. Electrolux Home..., Not Reported in...

Case 6:11-cv-01174-DEP   Document 196   Filed 06/04/13   Page 47 of 58

Arcara. A party who "fails to object timely ... waives any right to further judicial review of [this] decision". *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 58 (2d Cir.1988); *Thomas v. Arn,* 474 U.S. 140, 155, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).

Moreover, the district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the magistrate judge in the first instance. *Patterson–Leitch Co. v. Massachusetts Municipal Wholesale Electric Co.,* 840 F.2d 985, 990–91 (1st Cir.1988).

The parties are reminded that, pursuant to Rule 72(b) and (c) of the Local Rules of Civil Procedure for the Western District of New York, written objections shall "specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection ... supported by legal authority", and must include "a written statement either certifying that the objections do not raise new legal/factual arguments, or identifying the new arguments and explaining why they were not raised to the Magistrate Judge". Failure to comply with these provisions may result in the district judge's refusal to consider the objections.

Footnotes

1   Bracketed citations refer to CM/ECF docket entries.

2   Although her surname has now changed to Slocum, I will refer to her as Sherry Demrick.

---

**End of Document**                                    © 2013 Thomson Reuters. No claim to original U.S. Government Works.

Infinity Broadcasting Corp. v. Greater Boston Radio, II, Inc., Not Reported in F.Supp....

32 U.S.P.Q.2d 1925

1993 WL 343679
United States District Court, D. Massachusetts.

INFINITY BROADCASTING
CORPORATION, Plaintiff,
v.
GREATER BOSTON RADIO, II, INC., Defendant.

Civ. A. No. 93–11161–WF.   |   Aug. 18, 1993.

**Opinion**

**REPORT AND RECOMMENDATION**

KAROL, United States Magistrate Judge.

**I. INTRODUCTION**

*1  Plaintiff, Infinity Broadcasting Corporation ("Infinity"), owns the service mark "WBCN," which it uses as the call letters for its popular Boston radio station. It seeks a preliminary injunction to enjoin defendant, Greater Boston Radio, II, Inc. ("GBR"), from using the allegedly similar call letters "WBCS." This is a report and recommendation on Infinity's motion. *See* 28 U.S.C. § 636(b)(1)(B).

**II. OVERVIEW AND QUESTION PRESENTED**

WBCS is a new Boston FM radio station. It calls itself "Country 96.9," to signify that it plays exclusively country music and broadcasts on a frequency of 96.9. It reinforces this "brand name" with a slogan: "We're Boston's Country Station," for which the mark "WBCS" is an acronym. WBCS rarely, if ever, uses its call letters except as part of a package, in conjunction with this brand name and slogan. It strives to project what it calls a "squeaky clean," country image—one associated with patriotism, wholesomeness, and family-based traditional values. Artists such as Alabama, Garth Brooks, Dolly Parton, Billy Ray Cyrus, and Dwight Yoakam are featured. Announcers are low key and take a back seat to the music.

WBCN, on the other hand, is an established Boston radio station that broadcasts on a frequency of 104.1 FM. It calls itself "The Rock" or "The Rock of Boston," to signify that it plays hard rock music, when it is not broadcasting the controversial, sexually-oriented Howard Stern talk show,

which recently replaced a program called "The Sex Palace." WBCN strives to project an anti-authoritarian, bad-boy image. Artists such as Guns and Roses, Porno for Pyros, The Tragically Hip, and Life, Sex & Death are featured on programs with slogans such as "Lick Me." Announcers are loud, brash, and irreverent, and decidedly in the foreground.

The question presented is whether, taking into account the foregoing undisputed facts, the two stations are likely to be confused due to the similarity of their call letters.

**III. PRELIMINARY FINDINGS OF FACT**

Upon consideration of the arguments made and the extensive filings submitted, including voluminous memoranda, affidavits, declarations, deposition transcripts, and exhibits, the court makes the following preliminary findings of fact for purposes of the present motion: [1]

1. Infinity and GBR are both large, sophisticated broadcasting companies. Infinity is a Delaware corporation with a principal place of business in New York City, New York. It is engaged exclusively in the business of radio broadcasting, with 21 stations serving 13 of the nation's largest radio markets. In 1992, Infinity ranked second in total radio revenues among all companies owning radio stations in the United States. GBR is a wholly-owned subsidiary of Greater Media, Inc. ("Greater Media"). Greater Media is a Delaware corporation that, through its subsidiaries, owns and operates 15 radio stations, predominantly in major markets, including Boston, Los Angeles, Philadelphia, Detroit, and Washington, D.C.

*2  2. Since March 15, 1968, a radio station identified by the call letters "WBCN" has been broadcasting rock music in Boston over the frequency 104.1 FM. During most of that time, through the present day, the station has had an "album-oriented rock" format, which is to be distinguished, for example, from a "top 40" singles format. The station has become so successful that its present owner, Infinity, claims, without contradiction by GBR, that WBCN is Boston's leading rock station. Quarterly surveys taken by the national rating service Arbitron Company ("Arbitron") show that, for the past 12 years, WBCN has been the most popular radio station in the Boston metropolitan area among men between the ages of 18 and 34. It is also rated number one among men aged 25 to 54.

Infinity Broadcasting Corp. v. Greater Boston Radio, II, Inc.: Not Reported in F.Supp...

Case 6:11-cv-01174-DEP  Document 196  Filed 06/04/13  Page 49 of 58

32 U.S.P.Q.2d 1925

3. Infinity purchased WBCN on February 16, 1979, through its wholly-owned subsidiary Hemisphere Broadcasting Corporation ("Hemisphere"), and the mark "WBCN" was first used by Infinity on that date. [2] On September 10, 1985, Infinity, through Hemisphere, applied for federal registration of the service mark "WBCN." On May 6, 1986, "WBCN" became a federally registered service mark, Registration No. 1,392,641. On January 22, 1992, the mark "WBCN," which by this time had been assigned to Infinity, became "incontestable." *See* Lanham Trade–Mark Act, § 15, 15 U.S.C. § 1065.

4. GBR's parent, Greater Media, is no stranger to the Boston radio market. Since 1982, it has owned and operated a very successful FM radio station with the call letters "WMJX." This station, which is popularly known as "Magic 106.7," features an "adult contemporary" format. Greater Media also owns and operates the Boston AM station WMEX. In December 1992, Greater Media agreed to purchase a jazz station then known as WCDJ, which broadcasted on a frequency of 96.9 FM. The sale was completed, and the station began operating under its new call letters, "WBCS," in May 1993.

5. Commercial radio stations derive most of their revenue from the sale of advertising time to sponsors who wish to promote the sale of their goods and services to the station's listeners. The advertisers that a station attracts and the amount of air time that the advertisers are willing to purchase at any given rate depend on the type and size of the station's audience. Audience type is most often described in terms of geography and demographics, such as age, gender, ethnicity, and income levels. Size refers to the number of people, overall and within various demographic categories, listening at any given time. It is typically measured through Arbitron surveys, in which randomly-selected individuals are asked to record in diaries, among other things, the name, dial position, call letters, or other identifying characteristic of the station to which they are listening, whenever they are listening, over a one-week period. From these surveys, Arbitron extrapolates the number of persons, overall and by demographic category, listening to each station at any given time.

*3 6. Unlike most commercial television stations, radio stations, because there are so many of them, do not attempt to reach a mass audience. Rather, they have become "narrowcasters," in the sense that they attempt to deliver to their advertisers a target audience that represents a well-defined, narrow slice of the overall potential market. They seek to do this by having highly specialized formats, such as album-oriented rock, classical, top 40, rap, country, jazz, oldies, adult contemporary, all talk, all news, or all sports programming. Stations also attempt to differentiate themselves on the basis of the image they seek to project, which can range from staid and sedate to loud and controversial, or anything in between. Naturally, the format and image that a station selects for itself will, to a great extent, determine the demographic and lifestyle characteristics of its listeners.

7. Except for the fact that WBCS and WBCN both play music—all the time in the case of WBCS and most of the time in the case of WBCN—the two stations could not be further apart in terms of format and image. WBCS plays mainstream country music, including such contemporary and traditional artists as Alabama, Clint Black, Garth Brooks, Billy Ray Cyrus, The Judds, Reba McEntire, Ronnie Milsap, Dolly Parton, George Strait, Randy Travis, and Dwight Yoakam. WBCN plays album-oriented rock, featuring such artists as Soul Asylum, Lenny Kravitz, Aerosmith, The Kinks, Belly, Sting, Goo Foo Dolls, Copperhead, Porno for Pyros, Buddy Guy, and Life, Sex & Death. [3]

WBCS expects its announcers to be low key and to remain in the background, (*see* Decl. Frank Kabela ¶ 43, at 16); WBCN, in radio jargon, is a "personality-driven, foreground" station. (Def.'s Ex. II–1, Berardini Dep., at 152.) Its announcers tend to be dynamic, outrageous, and very prominent. For example, Charles Laquidara, host of WBCN's morning show "The Big Mattress," is billed as "the notorious ringmaster of the three-ring circus of the air that is The Big Mattress," someone whose "outlandish humor and revelry" and whose "comic capers" will surely generate "full-tilt game-show hilarity." (*See* Def.'s Ex. II–3A.) Consistent with its zany image, WBCN has conducted such unconventional promotions as dropping a van, a piano, and 500–pound pumpkins from the sky. (*See* Def.'s Ex. II–3P.)

The litany of differences between the two radio stations is, perhaps, best summed up in their disparate images. WBCS seeks to cultivate a wholesome country image, with emphasis on such traditional institutions and values as family and patriotism. In contrast, WBCN seeks to project a bad-boy, iconoclastic image through, for example, frequent use of off-color humor and double entendres that many listeners of WBCS, among others, would no doubt find offensive. [4]

Infinity Broadcasting Corp. v. Greater Boston Radio, II, Inc., Not Reported in F.Supp.2d...

Case 6:11-cv-01174-DEP Document 196 Filed 06/04/13 Page 50 of 58

32 U.S.P.Q.2d 1925

Because of these very substantial differences between the two stations, there is virtually no possibility that, based upon programming content alone, either station would be mistaken for the other. To the contrary, a regular WBCS listener who mistakenly tuned in WBCN would no doubt recognize his or her mistake almost instantly, as would a regular WBCN listener who mistakenly tuned in WBCS.

**\*4** 8. Through the use of its chosen format and image, WBCN has been exceptionally successful in attracting its primary target audience of male listeners aged 18 to 34. Over the past 12 years, it has been the top-rated Boston station in this category. WBCN's domination of this audience category has also enabled it to obtain a number one rating among males aged 25 to 54. Although WBCS has not been on the air long enough to generate any actual demographic data, its primary target audience is men and women, in equal proportion, who are over the age of 34.

9. Companies that advertise on radio, and the agents and brokers who represent them, are extremely sophisticated. There is virtually no possibility that any advertiser would mistakenly buy air time on WBCN thinking that it had bought air time on WBCS, or vice versa. WBCN concedes that this is "probably true." (Pl.'s Reply Mem.Supp.Mot.Perlim.Inj. at 12, n. 10.) WBCN argues, however, that the possibility remains that a WBCS sales representative might be able to take advantage of a prospective advertiser's momentary confusion to get his or her foot in the prospective advertiser's door. This is highly implausible speculation on WBCN's part.

10. There was no bad faith by GBR and Greater Media in connection with their selection of the call letters "WBCS," and no intent by them to exploit any alleged similarity between their chosen call letters and those of the plaintiff. The call letters "WBCS" were chosen because they are an acronym for the slogan "We're Boston's Country Station," which, as discussed below, was an integral part of a total marketing package for the new station. Furthermore, the formats and images of WBCS and WBCN are not only on different ends of the musical and lifestyle spectra, but they are antithetical to one another. A typical WBCS listener would likely find WBCN's programming to be tasteless and highly offensive, and there is no reason to believe that a WBCN devotee would think any more highly of WBCS's. Thus, WBCS would consider it not only futile but downright detrimental to be associated in the minds of listeners and prospective listeners with WBCN.

11. By law, every radio station in the United States must have a unique set of call letters approved by the Federal Communications Commission (the "FCC"). Although it has not always been the case, radio stations east of the Mississippi River must now have four call letters, with the first being "W;" stations west of the Mississippi must also have four call letters, with the first being "K." Quite frequently, radio stations choose the first letter of the name of the city in which the station is located as their second call letter. For example, Boston has radio stations with the call letters "WBCN," "WBCS," "WBET," "WBIM," "WBIV," "WBMT," "WBMX," "WBOQ," "WBOS," "WBRS," "WBRU," "WBSM," "WBUR," "WBVR," and "WBZ."[5] One finds the same pattern in Los Angeles, home of stations with the following call letters: "KLAX," "KLSX," "KLAC," "KLAX," "KLON," "KLOS," "KLVE," "KLRD," and "KLIT." Even where a station in a particular city does not use the city's first letter as its second call letter, it will frequently use it as its third or fourth. Again, using the same cities as illustrative, in Boston one can find stations WCIB, WCLB, WCRB, WHAB, WHHB, WHOB, WHRB, WJIB, WMBR, WNBP, WRBB, WSRB, WUMB, WVMB, WWBB, and WZBC; and in Los Angeles, one can find stations KALI, KKLA, KXLV, KCAL, KOLA, KZLA, KQLZ, KJLH, and KRLA.

**\*5** 12. The fact that, within any given city, stations often have two, three, or even four call letters in common, in and of itself, will not confer infringement immunity on a station whose call letters are confusingly similar to those of another. Nevertheless, it is reasonable to assume that radio listeners have become so accustomed to the overlap of call letters that they will not mistakenly conclude that two stations have common ownership merely because the stations have two or more common call letters. Infinity presented no evidence to the contrary. Thus, the court finds that listeners who *do* hear the distinction between the letters "WBCN" and "WBCS" are not likely to believe, mistakenly, that the two stations are somehow affiliated merely because their first three call letters are the same.

13. It must be emphasized that the use of call letters is only one of several ways that stations identify themselves. An equally, if not more important, identifier, especially in this age of digital car and home radios, is the station's frequency or dial position.[6] Stations also identify themselves through the use of brand names. WBCS, for example, combines its name and address into the brand name "Country 96.9," just as WBCN identifies itself as "The Rock," or "The Rock

Infinity Broadcasting Corp. v. Greater Boston Radio, II, Inc.; Not Reported in F.Supp....

Case 6:11-cv-01174-DEP Document 196 Filed 06/04/13 Page 51 of 58

32 U.S.P.Q.2d 1925

of Boston." Stations also use names (such as "The Big Mattress") to identify specific programs. Finally, stations identify themselves through the use of slogans, such as, in the case of WBCS, "We're Boston's Country Station."

14. WBCS made a conscious and deliberate effort to choose a series of elements as identifiers that would work together as an integrated package, with each element reinforcing the other, to tell the listener who, what, and where the station was. The package included a brand name ("Country 96.9") that identified the station's format and dial position; a slogan ("We're Boston's Country Station") that both reinforced the identification of the station's format and distinguished the station from Boston's other country station (WCLB, "The Country Club"); and call letters ("WBCS") that were an acronym for the slogan. Moreover, WBCS determined that its primary station identifier would be the brand name ("Country 96.9") and that its call letters would be used much less frequently and, then, only in conjunction with other package elements (as in "Country 96.9, We're Boston's Country Station, WBCS"). During this past May and June, the station spent hundreds of thousands of dollars for television advertising to launch the package. Significantly, the call letters in WBCS's television spots appear only at the end, when each letter, in sequence and through the use of animation, is transformed into the first letter of one of the words in the slogan "We're Boston's Country Station." The obvious purpose is to provide a mnemonic device to help the viewer make an association between the call letters, the slogan, and the format.

 **\*6** 15. The foregoing points all weigh heavily in favor of a conclusion that neither listeners nor advertisers are likely to confuse WBCN with WBCS. The only point on Infinity's side of the scale is that the letters "WBCN" and "WBCS," when spoken, do sound somewhat alike. Indeed, according to the testimony of Infinity's expert witness, a professor of linguistics at Indiana University, the phonetic similarity is so great, that notwithstanding any possible auditory, visual, or contextual differences between them, there is a substantial likelihood that the letter groups "WBCN" and "WBCS" will be confused.

For a number or reasons, however, this court is not persuaded by the testimony of Infinity's expert. As a preliminary matter, it is far from clear that this is a subject on which the expert testimony of a linguist is useful. After all, the subject on which the linguist is opining is whether the letters "WBCN" and "WBCS" sound so much alike that an average listener, upon

hearing one set, will mistakenly think that he or she has heard the other. Any person with average hearing ability, including the author of this opinion, is presumably as qualified as a linguist to make this determination. [7] Using its own sense of hearing as a standard, the court does hear some similarity between the two sets of call letters, but it believes it has no difficulty hearing a sufficient distinction between them to avoid mistaking one for the other.

Turning nevertheless to the substance of the expert's opinion, it is helpful in discussing its persuasiveness to separate the opinion into two parts: first, the portion which considers whether the call letters "WBCS" and "WBCN," in isolation, sound so much alike that persons of average hearing ability are likely to think they heard one when they actually heard the other; and, second, the portion which considers whether confusion is likely even when the mark "WBCS" is used in conjunction with the station's brand name ("Country 96.9") or the slogan for which it is an acronym, "We're Boston's Country Station."

The opinion of Infinity's expert that the call letters "WBCN" and "WBCS," standing alone, sound confusingly similar is difficult to reconcile with opinions he previously expressed in published articles. For example, in a 1987 article entitled *Phonetic Similarity and Trademark Law,* Infinity's expert classified letters into six "confusable sets." (Pl.'s Ex. 33 at 6–7.) He asserted in the article that the letters within each confusable set were confusable with each other, but not with the letters in other sets. (*See id.* at 6.) Using this method of classification, the expert placed the letter "S" (as in "WBC*S*") in Set 3 and the letter "N" (as in "WBC*N*") in Set 4. He further asserted that, although Set 3 and Set 4 were phonetically the most similar of all the so-called confusable sets, the letters in Set 3 were *not* phonetically confusable with those in Set 4. Thus, he wrote:

> **\*7** There is only one other set of letters that is structurally similar to set 3, i.e. set 4 (M N L). However, all other things being equal, sets 3 and 4 are not especially confusable since the final consonant of the syllable is an obstruent for set 3 and a sonorant for set 4. *Thus the most similar set of letters to set 3 (i.e. set 4) is not especially confusable with set 3.*

*Id.* at 6 (emphasis added).

Infinity Broadcasting Corp. v. Greater Boston Radio, II, Inc., Not Reported in F.Supp....

32 U.S.P.Q.2d 1925

Efforts by Infinity's expert to reconcile this article with the opinion he expressed in this case are not persuasive. Thus, in his written opinion in this case, (Pl.'s Ex. 35), the expert attempts to reconcile the apparent inconsistency by contending that the letters "S" and "N", although not ordinarily confusable, become confusable when they appear as the last letter in a word. He states that "it is well established that phonetic differences at the middle or end of a word are not perceptually salient...." (Pl.'s Ex. 35 at 2–3.)

Unfortunately for Infinity, this unqualified statement does not appear to be supported by the research upon which the expert purports to rely. The research, which the expert himself summarizes in his 1987 article, suggests only that phonetic differences in the middle or at the ends of words are *less* salient than differences at the beginning, not that they are *not* salient. Thus, the article states:

> There has been considerable psychological research establishing phonetic context as an important factor in speech perception. Specifically, phonetic differences at the beginning of words are perceptually more salient than the same phonetic differences at the end or in the middle of words.

(Pl.'s Ex. 33 at 6.) [8]

On the basis of the research on which Infinity's expert purports to rely, one can only conclude, therefore, that a phonetically salient difference exists between "S" and "N" and that this difference is more salient when those letters begin words than when they end them. That conclusion falls far short of the mark, however, because it says nothing about the likelihood of confusion, in absolute terms, when the letters "S" and "N" come at the ends of otherwise identical words (or, as in this case, of otherwise identical call letters). For example, it is one thing to say that "kiss" and "kin" are less phonetically distinguishable than "sun" and "nun," but quite another to say flatly that the difference between "kiss" and "kin" is not phonetically salient. The research would apparently support the former statement but not the latter. The opinion testimony of Infinity's expert is, thus, not supported by sufficient scientific evidence in the record for the court to find it persuasive. [9]

Not only does the testimony lack adequate scientific support, but it is difficult to reconcile it with the factual record. It is undisputed that, for the year before WBCS came into existence, there was not a single instance in which an Arbitron diarist mistakenly recorded in his or her diary the then non-existent call letters "WBCS." (*See* Decl. Todd E. Doren ¶ 28, at 10.) If Infinity's expert were correct that the letters "WBCN" sound so much like the letters "WBCS" that listeners with average hearing ability will often think they hear "WBCS" when, in fact, the speaker is saying "WBCN," then one would expect to find at least a few instances over the course of a year where WBCN listeners incorrectly recorded the then non-existent call letters "WBCS" in their Arbitron diaries. Yet, this never occurred. The conclusion the court draws from this is that listeners have no difficulty perceiving a difference between the sound of the call letters "WBCN" and "WBCS."

**\*8** This leaves for consideration the portion of Infinity's expert's opinion dealing with the effect of context on the likelihood of confusion. For this purpose, the court will assume, although it finds to the contrary, that persons with average hearing ability might have difficulty distinguishing between the sound of the letters "WBCN" and "WBCS" standing alone. The fact is that the letters "WBCS" are always used in conjunction with the slogan for which it is an acronym, "We're Boston's Country Station," and often with the brand name "Country 96.9." This fact must be taken into account. It is not clear that Infinity's expert adequately did so or even that he has the necessary expertise to do so.

The essence of his testimony was that use of the call letters in conjunction with a slogan, brand name, or dial position would not reduce the otherwise high potential for confusion, because listeners would have difficulty making a "paired association" between the call letters, on the one hand, and the slogan, brand name, or dial position, on the other. Four points undermine the court's confidence in the validity of this opinion. First, Infinity's expert, who is not a psychologist and has no experience in the field of advertising, marketing, or broadcasting, has, at best, marginal qualifications to express an opinion in this area. The entire multi-billion dollar advertising industry is based on the premise that "paired associations" of one kind or another can be established, whether between Pepsi Cola and the concept of youth, McDonald's and the slogan "You Deserve a Break Today," or, for that matter, WBCN and its tag line "The Rock of Boston." The court is simply unwilling to accept the conclusion, solely on the basis of the testimony of an expert in linguistics, that all such efforts are futile.

Second, the only study the expert cited as the basis for his opinion was an unpublished experiment done by a psychologist with whom the expert was associated in another litigation matter. The expert agreed on cross examination that he did not "remember very much about the study." (Tr. at 138.) Moreover, he was unable to provide sufficient detail about its substance or methodology to enable the court to make any assessment of its relevance or reliability. (*See* Tr. at 108–10.)

Third, the expert did not give adequate consideration to the extensive use by GBR of visual media, particularly television, to teach the public that the mark "WBCS" is an acronym for "We're Boston's Country Station." It is also questionable whether an expert in linguistics would have the necessary qualifications to assess the effectiveness of visual media in creating "paired associations."

Finally, although the expert never clearly defined the term "paired association," its relevance to the question presented is doubtful. The question is not so much whether, for example, the number "96.9" will immediately pop into a listener's mind whenever he or she hears the call letters "WBCS." Rather, the question is whether there is a sufficient difference between the sound and meaning conveyed by the phrase "Country 96.9, We're Boston's Country Station, WBCS" and the phrase "WBCN, The Rock of Boston, 104.1" to alert the average listener to the fact that each refers to a different station.

**\*9** 16. For all the reasons stated, it is doubtful that Infinity will be able to prove that confusion between the call letters "WBCN" and the call letters "WBCS" is likely.

### IV. CONCLUSIONS OF LAW

1. This is an action for service mark infringement in which Infinity seeks a preliminary injunction under Sections 32 and 43(a) of the Lanham Trade–Mark Act, 15 U.S.C. §§ 1114, 1125(a), [10] and M.G.L. ch. 110B, § 12. [11] Jurisdiction is founded under Section 39 of the Lanham Trade–Mark Act, 15 U.S.C. § 1121, and under 28 U.S.C. §§ 1338(b) and 1367.

2. A preliminary injunction is a drastic remedy that "must be used sparingly and only in cases where the need for extraordinary equitable relief is clear and plain." *Augusta News Co. v. News America Publishing, Inc.,* 750 F.Supp. 28, 31 (D.Me.1990). In order to issue a preliminary injunction, the court must find:

(1) that the plaintiff has demonstrated a likelihood of success on the merits; (2) that the plaintiff will suffer irreparable injury if the injunction is not granted; (3) that the potential injury to the plaintiff outweighs the injury that issuance of the injunction will cause the defendant; and (4) that the injunction will not adversely affect the public interest.

*Planned Parenthood League v. Bellotti,* 641 F.2d 1006, 1009 (1st Cir.1981).

3. Infinity is the registered owner of the service mark "WBCN." Its right to use that mark is incontestable and, therefore, exclusive. *Keds Corp. v. Renee Int'l Trading Corp.,* 888 F.2d 215, 220 (1st Cir.1989). The question of whether plaintiff is likely to succeed on the merits thus turns entirely on whether there is a likelihood of confusion between its use of the mark "WBCN" and GBR's use of the mark "WBCS." *See Boston Athletic Ass'n v. Sullivan,* 867 F.2d 22, 28 (1st Cir.1989).

4. The First Circuit has repeatedly identified eight factors to be weighed in assessing likelihood of confusion, no one of which is determinative and each of which must be considered. They are: (1) the similarity of the marks; (2) the similarity of the goods; (3) the relationship between the parties' channels of trade; (4) the relationship between the parties' advertising; (5) the classes of prospective purchasers; (6) evidence of actual confusion; (7) the defendant's intent in adopting its mark; and (8) the strength of the plaintiff's mark. *See, e.g., Sullivan,* 867 F.2d at 487. Importantly, the standard is not one of possible or conceivable confusion, but of probable confusion. *See Alpha Indus. v. Alpha Steel Tube & Shapes, Inc.,* 616 F.2d 440, 443 (9th Cir.1980); *USA Network v. Gannett Co.,* 584 F.Supp. 195, 198 (D.Colo.1984).

### (1) Similarity of Marks

The First Circuit has made it clear that, in assessing the similarity of two marks, the marks must be considered not in the abstract but in the context of the way in which they are actually presented to the public. *See Pignons S.A. de Mecanique de Precision v. Polaroid Corp.,* 657 F.2d 482, 487 (1st Cir.1981) ("similarity is determined on the basis of the total effect of the designation, rather than a comparison

Case 6:11-cv-01174-DEP Document 196 Filed 06/04/13 Page 54 of 58

Infinity Broadcasting Corp. v. Greater Boston Radio, II, Inc., Not Reported in F.Supp....

32 U.S.P.Q.2d 1925

of individual features"). In *Pignons,* the plaintiff sold a 35mm single lens reflex camera under the name "Alpa," while the defendant marketed its 35mm instant camera under the phonetically-similar name "Alpha." *See id.* at 484–85. The court affirmed the granting of summary judgment for defendant. *Id.* at 495. In doing so, it relied, in part, on the fact that the defendant, Polaroid, always used the word "Alpha" in connection with other, uniquely identifying language. Thus, the court stated:

**\*10** In the present case, the total effect of Polaroid's designation of its SX–70 Alpha cameras minimizes, if it does not eliminate, the possibility that Polaroid's mark might be confused with Pignons'. On the cameras themselves, and in Polaroid's advertising, the word 'Alpha' always appears in close proximity with an equally prominent and uniquely identifying designation, such as 'Polaroid SX–70 Land Camera Alpha 1'....

*Pignons,* 657 F.2d at 487.

Two years later, in *Astra Pharmaceutical Prods., Inc. v. Beckman Instruments, Inc.,* 718 F.2d 1201 (1st Cir.1983), the First Circuit again looked to the "total effect" of the mark rather than to its "individual features." Again, the case involved an appeal from the granting of summary judgment to defendant, and, again, the judgment was affirmed. *See id.* at 1210. This time, however, defendant's allegedly infringing mark, "Astra," was not just similar to plaintiff's, but identical. *Id.* at 1205. Plaintiff used the mark to identify drugs that it sold to hospitals, while defendant used it as the brand name for a blood analyzer which it, too, sold to hospitals. *See id.* at 1203–04. The court stated:

In spelling and sound, ... the marks are identical. However, as we stated in *Pignons,* 'similarity is determined on the basis of the total effect of the designation, rather than a comparison of individual features.' ... It is well settled that under certain circumstances otherwise similar marks are not likely to be confused where used in conjunction with the clearly displayed name and/or logo of the manufacturer.... This rule would seem to apply in this case, where the Beckman name is clearly visible on the analyzer.

*Astra Pharmaceutical,* 718 F.2d at 1205; *see also Alpha Indus.,* 616 F.2d at 444 (although both parties used "Alpha" in connection with the sale of tubing or tube manufacturing equipment, there was no confusing similarity where defendant always did so in conjunction with other

words, such as "steel," "tube," or "shapes," and plaintiff used "Alpha" standing alone).

For reasons previously stated, the court finds that the call letters "WBCN" and "WBCS," even standing alone, have at most a moderate degree of similarity. Applying the *Pignons* and *Astra Pharmaceutical* "total effect" principle, under which even identical marks are not considered to have a high degree of similarity if, in context, they are easily distinguishable, it must be concluded that the two sets of call letters are dissimilar. The mark "WBCS" is always presented in conjunction with the slogan "We're Boston's Country Radio," for which it is an acronym, and usually with the brand name "Country 96.9." The letter group "WBCN," in contrast, is always presented either alone or in conjunction with the phrase "The Rock," or "The Rock of Boston," and often in association with the dial position 104.1. The two marks, as heard and seen in context, are easily distinguishable.

### (2) Similarity of Goods

**\*11** In the most general sense, the goods in this case may be said to consist of the entertainment that the stations provide to their listeners and the audiences that they provide to their sponsors. Given the marketing realities of the radio broadcast industry, however, it would be far more meaningful to characterize the goods in terms of the specific type of entertainment each station provides, taking into account each station's individual format and personality, as well as the distinct type of audience that is attracted to that format and personality. Considered on that basis, the goods involved in this case are greatly dissimilar, for all the reasons stated.

### (3)–(5) Channels of Trade; Advertising; and Customers

With respect to the parties' channels of trade, advertising, and prospective customers, both stations use marketing representatives to sell air time to sponsors. Sometimes the prospective sponsors are the same, and sometimes they are not. For example, both stations might try to sell air time to an automobile manufacturer, but only WBCS might try to sell air time to a local club that features country dancing. Some sponsors might prefer the demographic characteristics of one station's audience over those of the other; others might find both stations' audiences equally desirable or undesirable. The overriding consideration here, however, as already noted,

Infinity Broadcasting Corp. v. Greater Boston Radio, II, Inc., Not Reported in F.Supp....

32 U.S.P.Q.2d 1925

is that the sponsors and their representatives are highly sophisticated and very unlikely to be confused.

This leaves the listeners themselves for consideration. It is not clear that listeners should be considered "customers" for purposes of the present analysis. *See Walt–West Enters., Inc. v. Gannett Co.,* 695 F.2d 1050, 1061 (7th Cir.1982) ("in an economic sense, radio listeners are not the radio stations' customers, but rather, they ... are its product"); *accord USA Network v. Gannett Co.,* 584 F.Supp. at 200. Unlike the ordinary customer, a radio listener pays nothing for the services he or she consumes and does not have to leave home, car, or office to procure them. In the unlikely event a listener mistakenly tunes in WBCS while looking for WBCN, or vice versa, he or she can immediately correct the mistake by a spin of the dial, with minimal inconvenience and at no expense. In any event, whether or not listeners are deemed to be customers, the stations appeal to persons with very different tastes and sensibilities, who would immediately recognize a difference between WBCS's programming and WBCN's. In fact, the difference would immediately be recognizable even to that rare individual to whose tastes both stations appealed.

### (6) Actual Confusion

The next item to be considered is evidence of actual confusion. Although proof of actual confusion is not required, its presence is obviously probative of the question whether the marks are confusingly similar. *See Pignons,* 657 F.2d at 490 ("[e]vidence of actual confusion is not invariably necessary to prove likelihood of confusion; [but] ... 'absent evidence of actual confusion ... there is a strong presumption that there is little likelihood of confusion' " (citations omitted)). Here, there was evidence of some actual confusion, but it was minimal. What little confusion there was consisted mainly of a few misdirected telephone calls to WBCN from listeners who were trying to call WBCS. Significantly, all the callers fully appreciated the fact that WBCN was a different station from the one they were trying to reach. They had apparently been given the wrong number by the local telephone company as the result of GBR's failure to advise the telephone company that the station's call letters had been changed to "WBCS." [12] Such temporary *de minimis* confusion is of minimal legal significance. *See Astra Pharmaceutical,* 718 F.2d at 1207– 08. There was no evidence that any listener or advertiser upon hearing the call letters "WBCS" thought they had heard the call letters "WBCN," or vice versa.

### (7) Defendant's Intent

**\*12**  As noted, defendant's intent in adopting the mark was entirely innocent. Although GBR gave some thought to whether the letters "WBCS" might be confused with the letters "WBCN," defendant only went ahead after satisfying itself that confusion would not likely result. To the extent defendant's intent has any bearing, it supports the conclusion that the marks are not confusingly similar.

### (8) Strength of Plaintiff's Mark

For purposes of this opinion, the court is persuaded that "WBCN" is a strong mark.

5. Taking the preceding factors into account, the likelihood of confusion is minimal. Infinity has, thus, failed to demonstrate that it is likely to succeed on the merits of its infringement claim.

6. Infinity has also sought an injunction under the Massachusetts trademark dilution statute, M.G.L. ch. 110B, § 12. To prevail under this statute, a plaintiff must satisfy a two-pronged test and show that (a) its mark is distinctive; and (b) the defendant's use of a similar mark has created the likelihood of confusion. *Pignons,* 657 F.2d at 493–494.

The court assumes *arguendo* that Infinity's mark "WBCN" is distinctive and goes on to consider the "likelihood ... of dilution of the distinctive quality" of Infinity's mark. To show likelihood of dilution, Infinity must adduce sufficient evidence under one of three alternatives: (1) injury to its mark's value caused by actual or potential customer confusion; (2) injury resulting from defendant's use of a mark in a way that detracts from, draws on, or otherwise appropriates the goodwill and reputation associated with plaintiff's mark; or (3) diminution in the uniqueness and individuality of plaintiff's mark. *Astra Pharmaceutical,* 718 F.2d at 1209.

In Paragraph 5 of these Conclusions of Law, this court has already determined that the likelihood of customer confusion between the marks "WBCN" and "WBCS" is minimal. Thus, the value of Infinity's mark could not have suffered injury as the result of actual or potential confusion.

Case 6:11-cv-01174-DEP Document 196 Filed 06/04/13 Page 56 of 58

Infinity Broadcasting Corp. v. Greater Boston Radio, II, Inc.,  Not Reported in F.Supp....

32 U.S.P.Q.2d 1925

With respect to GBR's appropriating the goodwill and reputation associated with the call letters "WBCN," the court has made findings of fact that GBR almost always uses its call letters "WBCS" in conjunction with its brand name ("Country 96.9") or its slogan ("We're Boston's Country Station"). Moreover, this court has found that each station appeals to a distinctive audience category and that there is virtually no possibility that the stations will be mistaken for each other. These facts make GBR's appropriation of the goodwill and reputation accruing to the call letters "WBCN" both unlikely and, from GBR's perspective, undesirable.

Finally, although the mark "WBCN" is unique, the court remains unconvinced that the mark's individuality has been diminished by GBR's use of the call letters "WBCS." The court has already noted that there is a sufficient disparity between the images, programming, formats, and advertising of the two radio stations—as well as between the marks themselves—to prevent confusion. "For the same reasons, there is sufficient dissimilarity to prevent dilution." *Astra Pharmaceutical,* 718 F.2d at 1210.

**\*13** 7. The next item to be considered is irreparable harm. If Infinity had demonstrated a likelihood of success on the merits, irreparable harm would have been presumed. *See, e.g., Societe Des Produits Nestle, S.A. v. Case Helvetia, Inc.,* 982 F.2d 633, 640 (1st Cir.1992) ("[i]rreparable harm flows from an unlawful trademark infringement as a matter of law"). Since Infinity failed to demonstrate a likelihood of success on the merits, it also failed to demonstrate that any harm, irreparable or otherwise, is likely to result from GBR's use of the call letters "WBCS." [13]

8. Balancing the equities, this court concludes that the harm to GBR, if a preliminary injunction issues, will outweigh the potential harm to Infinity, if one does not issue. This is because the case, for all practical purposes, will be over if GBR is preliminarily enjoined. A preliminary injunction will force GBR immediately to begin using new call letters. Once GBR begins doing so, it is highly unlikely it will ever revert to the old ones, even if it ultimately prevails. WBCN, on the other hand, is not going to begin using different call letters if a preliminary injunction is denied. Thus, even when consideration of the hundreds of thousands of dollars that GBR spent promoting the package "Country 96.9, We're

Boston's Country Station," is put aside, the equities favor defendant. *See Virginia Tech,* 666 F.Supp. at 860.

9. The final element to be considered is whether issuance of a preliminary injunction would adversely affect the public interest. There is no reason to believe that it would do so.

## V. RECOMMENDATION

Because Infinity has not demonstrated a likelihood of success on the merits, and to a lesser extent because the equities favor GBR, it is recommended that Infinity's motion for a preliminary injunction be denied.

## IMPORTANT NOTICE OF RIGHT TO OBJECT AND WAIVER OF RIGHT TO APPEAL FOR FAILURE TO DO SO WITHIN TEN DAYS

The parties are hereby advised that under the provisions of Rule 3(b) of the Rules for United States Magistrates in the United States District Court for the District of Massachusetts, any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court WITHIN 10 DAYS of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has indicated that failure to comply with this rule shall preclude further appellate review by the Court of Appeals of the District Court's order entered pursuant to this Report and Recommendation. *See United States v. Valencia–Copete,* 792 F.2d 4 (1st Cir.1986); *Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603 (1st Cir.1980); *United States v. Vega,* 678 F.2d 376 (1st Cir.1982); *Scott v. Schweiker,* 702 F.2d 13 (1st Cir.1983); *see also Thomas v. Arn,* 474 U.S. 140 (1985).

**Parallel Citations**

32 U.S.P.Q.2d 1925

Footnotes

Infinity Broadcasting Corp. v. Greater Boston Radio, II, Inc., Not Reported in F.Supp....

Case 6:11-cv-01174-DEP Document 196 Filed 06/04/13 Page 57 of 58

32 U.S.P.Q.2d 1925

1   At oral argument on July 15, 1993, counsel for Infinity and GBR agreed that there was no need to present live testimony and that the motion for preliminary injunction could be decided on the basis of the materials that had already been submitted.

2   The mark "WBCN" was subsequently assigned to Infinity.

3   WBCS claims that there is not a single piece of music on its play list (the hundreds of songs in its music library from which it selects the songs that it plays on the air) that is also on WBCN's play list. (*See* Decl. Charles Banta ¶ 21, at 8.) WBCN does not dispute this claim. Whether it is literally true or not, the point is well-taken that the two stations appeal to entirely different musical tastes. This is borne out by Arbitron's "cume duplication" statistics, which show the percentage of a station's audience that also listens to another station. For example, the cume duplication between WBCN and WZLX, another rock station, was 43%, while the cume duplication between WBCN and WCLB, until recently Boston's only country station, was a meager 8%. (*Id.* ¶ 23, at 9.) Cume duplication statistics between WBCN and WBCS are not yet available.

4   For example, among the exhibits introduced into evidence was a WBCN flyer for a Sunday evening program entitled "Nocturnal Emissions," hosted by an announcer named Oedipus. (*See* Def.'s Ex. II–3W.) Also introduced was a photograph of various items of promotional underwear that WBCN had distributed and on which its "Lick Me" slogan was prominently displayed. (*See* Def.'s Ex. II–3P at Attachs.) Recently, as a replacement for a show called "The Sex Palace," WBCN began carrying the controversial Howard Stern show, which was cited by the Federal Communications Commission for indecency in broadcasting. (*See* Decl. Frank Kabela, Jr., ¶ 44, at 16.) WBCS was quick to note that its purpose in offering this evidence was not to condemn, but to distinguish, WBCN; in fact, as WBCS pointed out, its parent, Greater Media, carries the same Howard Stern show on its Los Angeles classic rock station, KLSX. (*See, id.*) Similarly, the court does not allude to these items in any judgmental way, but merely to illustrate the enormous image gap that, by design, separates the two stations.

5   WBZ adopted its call letters before the FCC began requiring stations to use four letters to identify themselves.

6   Assuming that a listener knows a station's call letters and its actual or approximate dial position, it stands to reason that the listener will use the dial position as the primary locator when searching for the station, rather than randomly flipping through stations hoping that an announcer will just happen to mention the desired call letters at the moment the desired station is tuned in.

7   See *Virginia Tech Foundation Inc. v. Family Group Ltd. V,* 666 F.Supp. 856 (W.D.Va.1987), a call letter dispute in which the court stated:

> The experts, in my opinion, did more to obfuscate the problem than they did to clarify it. They undertook to describe in technical and polysyllabic jargon that which is obvious to the ordinary person with reasonably good vision and hearing. They undertook to tell me that the four letters in the call letters of the two stations either did or did not look alike and sound alike. In my judgment, this is a classic misuse of expert testimony, and I give very little weight to any of it.

> *Id.* at 858.

> In *Virginia Tech,* the plaintiff, a radio station with the call letters "WVTF," sought a preliminary injunction against the use of the call letters "WVFT" by the defendant television station. The expert who testified for Infinity in the instant case testified on behalf of the defendant in *Virginia Tech.* The substance of this expert's testimony in *Virginia Tech* appears to have been that there was no confusing similarity, taking into account, among other things, "the use of the call letters in conjunction with other visual or spoken material...." *Id.* The preliminary injunction was denied.

8   In support of their expert's research consistency, Infinity cites a sentence in the conclusion section of his 1987 article stating that "phonetic differences of whatever kind at the end of a word do not contribute to distinctness." (*See* Pl.'s Reply Mem.Supp.Mot.Prelim.Inj. at 6–7 n. 4 (quoting Pl.'s Ex. 33 at 8).) This assertion, however, is not supported by the arguments set forth in the body of the paper. Moreover, common experience teaches that this assertion cannot be true. For example, even though the letters "B" and "G" are in the same confusable set, (*see* Pl.'s Ex. 33 at 7), they surely, to some degree, contribute to distinctness between the words "tag" and "tab."

9   The court also finds other aspects of the opinion of Infinity's expert not to be persuasive. In Plaintiff's Exhibit 35, the expert claims that, with a few exceptions not here relevant, there is "no other call sign that is more similar to WBCN than WBCS." (Pl.'s Ex. 35 at 3.) To the court's ear, the call letters "WBZN" and "WPCN," to take just two examples, would sound much more like "WBCN" than does "WBCS". Infinity's expert does not state the basis for his belief that pairs of letters which ordinarily have a higher degree of phonic similarity, such as "Z" and "C," or "P and B," are, when they come in the middle of words, less confusingly similar than pairs of letters which ordinarily have a lesser degree of phonic similarity, such as "S" and "N," when these pairs occur at the ends of words. Also, the court is highly dubious of the opinion of Infinity's expert that call letters such as "WPGL" would "share a critical degree of similarity with WBCN." (*See* Pl.'s Ex. 35 at 3.) The court cannot help but doubt the reliability of any methodology that produces such a highly suspect result.

10  Section 32 of the Lanham Trade–Mark Act provides that "[a]ny person who shall, without the consent of the registrant ... use in commerce any ... colorable imitatin of a registered mark ... which ... is likely to cause confusion, or to cause mistake, or to deceive ... shall be liable in a civil action by the registrant." Lanham Trade–Mark Act, § 32(1), 15 U.S.C. § 1114(1)(a). A claim under Section

43(a) requires proof of the same elements, except that proof of a registered mark is excused. *See* Lanham Trade–Mark Act, § 43(a), 15 U.S.C. § 1125(a).

11    M.G.L. ch. 110B, § 12 provides that "[l]ikelihood of injury to business reputation or of dilution of the distinctive quality of a mark ... shall be a ground for injunctive relief notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services."

12    It may be inferred that when callers sought to obtain WBCS's telephone number from the information operator, they were given the number for WBCN because, for a period of time following the change, there was no listing for WBCS under its new call letters.

13    Infinity devoted considerable attention to the fact that its ratings, and thus its revenues, are dependent on the results of Arbitron surveys. Infinity seemed to be concerned about two potential problems. First, it was concerned that if a diarist who intended to record the mark "WBCN" mistakenly wrote down the letters for a non-existent station, such as "WBCX," Arbitron would have difficulty deciding whether to credit that entry to WBCN or to WBCS. Its second concern was that a diarist might mistakenly put down the call letters "WBCS" instead of "WBCN," in which case WBCN would definitely lose the credit for that entry. Both concerns go to the question of whether Infinity would suffer a loss of revenue if confusion were to occur; neither goes to the question whether confusion is likely to occur. Thus, the discussion of Arbitron's methodology has little, if any, bearing on the issue before the court. *If* Infinity had demonstrated a likelihood of confusion, the court would have presumed the existence not only of harm but of irreparable harm, even in the complete absence of proof of an adverse effect on revenue.

---

**End of Document**                                      © 2013 Thomson Reuters. No claim to original U.S. Government Works.

**Westlaw**Next® © 2013 Thomson Reuters. No claim to original U.S. Government Works.                                      11